**COMMISSIONER OF INTERNAL REVENUE v. JACOBSON.**

**JACOBSON v. COMMISSIONER OF INTERNAL REVENUE.**

Nos. 9319, 9320.

Circuit Court of Appeals, Seventh Circuit.

Dec. 5, 1947.

the meaning of Sec. 22 (a) and (b) of the Revenue Act of 1938 and the Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code, § 22(a, b), from his purchase at a discount of his own mortgage bonds originally issued at par (1) as a result of direct negotiations between the taxpayer and the bondholders, and (2) as a result of negotiations with the bondholders carried out by agents of the taxpayer or with an agent of the bondholders, both parties knowing of the agency.

The Tax Court held that situation (1) above was controlled by Helvering v. American Dental Co., 318 U.S. 322, 63 S. Ct. 577, 87 L.Ed. 785, but that situation (2) was controlled by United States v. Kirby Lumber Co., 284 U.S. 1, 52 S.Ct. 4, 76 L. Ed. 131. The Commissioner contends that the Kirby Lumber Co. case controls both situations, while the taxpayer urges that the American Dental Co. case is controlling as to both.

A third issue is whether the Tax Court erred in approving the Commissioner's computation under Rules of Practice Board of Tax Appeals, rule 50, 26 U.S.C.A. Int.Rev. Code following section 5012, with respect to the amounts allowed the taxpayer for entertainment expenses.

On or about May 1, 1925, the taxpayer borrowed the sum of $90,000 from the South Side Trust and Savings Bank of Chicago, Illinois; and he and his wife executed 200 bonds secured by a mortgage trust deed on a building located at the northwest corner of 47th Street and Drexel Boulevard, Chicago, and a leasehold running for 99 years from May 1, 1914, to evidence and secure the payment of the loan. The bonds were payable at the rate of $2,500 semi-annually, to and including November 1, 1931, and the balance of $57,500 on May 1, 1932, with interest at 6½% per annum. All the bonds which became due up to and including November 1, 1931 were paid at or about their respective maturity dates.

The South Side Trust and Savings Bank closed on June 8, 1931, and a bondholders' committee was formed for the bondholders who had purchased bonds on taxpayer's building. On May 1, 1932, the taxpayer, after communicating with the individual

Charles Oliphant, Acting Chief Counsel, and Claude R. Marshall, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., Theron L. Caudle, Asst. Atty. Gen., and Sewall Key, Helen R. Carloss, and Morton K. Rothschild, Sp. Assts. to Atty. Gen., for the Commissioner.

William B. Cockley and Walter A. Marting, both of Cleveland, Ohio, and Sidney C. Nierman, of Chicago, Ill. (Jones, Day, Cockley & Reavis, of Cleveland, Ohio, of counsel), for taxpayer.

Before MAJOR and KERNER, Circuit Judges, and LINDLEY, District Judge.

MAJOR, Circuit Judge.

These petitions are here to review a decision of the Tax Court of the United States. In No. 9319, the Commissioner requests a review of that part of the decision unfavorable to him, and in No. 9320, Lewis F. Jacobson (taxpayer) requests a review of that part of the decision unfavorable to him. The petitions in each instance have to do with deficiencies in the taxpayer's income taxes for the years 1938, 1939 and 1940.

The principal issues involved are whether the taxpayer realized taxable income within

bondholders as well as the bondholders' committee, procured an extension to May 1, 1937 for payment of the principal of the bonds.

During the extended period checks for interest were issued by taxpayer directly to the holders of the bonds, which were delivered to them by R. W. Gerding, secretary of the committee. Bondholders frequently visited the taxpayer at his office in connection with the collection of their interest and to ascertain the financial status of the debtor. The taxpayer kept a list of the bondholders, the dates of the payment of their interest, the numbers of their bonds and their addresses, and was fully informed as to who owned the bonds as well as their whereabouts, and they were kept informed from time to time as to taxpayer's general financial condition.

In 1937, the taxpayer paid 10% on account of the principal of the bonds then outstanding and again procured an extension of time for the payment of the remaining bonds to 1942.

As of January 1, 1938, the principal amount of the bonds unpaid was $51,750.-00. The Tax Court found that the taxpayer was solvent during each of the taxable years 1938, 1939 and 1940, and we accept the finding, although a perusal of the record makes it quite apparent that he was in straitened financial circumstances. The Tax Court having thus found, we see no occasion to relate the somewhat lengthy and complicated facts concerning the value of the building which secured the bonds, its depreciation, the rental income derived therefrom, or the extent of the taxpayer's income from other sources.

The taxpayer is a lawyer and during the taxable years was a member of the firm of Jacobson, Nierman & Silbert, attorneys at law. Commencing in 1938 and continuing through the years 1939 and 1940, the taxpayer purchased certain of his outstanding bonds either directly from the bondholders or through his agent or an agent of the bondholders at amounts less than their face value. The difference between the face amount of such bonds and the amount at which they were purchased was included by the Commissioner as a part of the taxpayer's gross income, and it was this action of the Commissioner which formed the main subject of controversy before the Tax Court.

The Tax Court made detailed findings as to the dates, amounts and other circumstances concerning each bond purchased. The Commissioner has in the main repeated such findings in his brief. For the purpose of this opinion, we are of the view that a brief résumé of such facts is sufficient. During the year 1938, purchases were made from three bondholders, the face value of which was $4,950, for the sum of $2,227.50, or a difference of $2,722.50. The purchase made on April 9, 1938, from Beatrice Johnson and Margaret Finn is typical of the other two purchases. The checks of Sidney C. Nierman (a partner of the taxpayer whose office was the same as the taxpayer's) were issued to the owners of the bonds, with an endorsement that they were in full payment of the purchase price of the bonds. The taxpayer reimbursed Nierman for this payment, as Nierman was acting for him in the transaction and the owners of the bonds knew that he was.

Three purchases were made in 1939, one on June 16, wherein the taxpayer paid directly $225 for bonds having a face value of $450. On February 15, 1939, the taxpayer purchased bonds of the face value of $1,800, owned by one Samuels, through McGraw & Company, for the sum of $900. On October 23, 1939, taxpayer purchased bonds of a face value of $180, owned by one Zentner, through the firm of Anderson, Plotz & Company, for the amount of $86.-50, and paid the firm a fee of $10 for making the purchase. In 1940, the taxpayer made eight purchases of bonds at less than their face value, four of which were through R. W. Gerding, secretary of the bondholders' committee, for which he paid the latter a fee in each instance, ranging from $7.50 to $27. Four other purchases in this year were made, all at less than their face value, through Anderson, Plotz & Company, and in each a fee was paid, ranging from $4.50 to $25. The total face value of the bonds thus purchased in 1940 by the taxpayer was the sum of $7,020.00, and the amount paid by the taxpayer was the sum of $2,950, or a difference of $4,070.

The Tax Court found: "There was never any listing of the bonds or quoted price. Nobody was buying these bonds except petitioner."

Inasmuch as the Tax Court differentiates between the bonds purchased by the taxpayer directly from the owners thereof and those purchased by the taxpayer through an agent, either of his or the bondholder, it appears pertinent to note the circumstances connected with these so-called agency purchases. R. W. Gerding, who acted as the agent of the taxpayer as to the purchase of certain bonds, was instructed by the taxpayer as to the price he was willing to pay. Each of the bondholders knew that the bonds were being sold to the taxpayer. They knew where Gerding's office was located and knew that he was in at all times, while the taxpayer was out of his office much of the time. When they dealt with Gerding they did so with knowledge that he was the agent of the taxpayer. When a bond was purchased by Gerding, the taxpayer was notified, his check was issued to the holder from whom the bond was being purchased and delivered to Gerding.

There was only one purchase through McGraw & Company, which was a bond owned by H. N. Samuels. Samuels had first contacted the taxpayer, requesting payment on his bond. Subsequently the taxpayer was approached by McGraw & Company, acting for Samuels, and the taxpayer agreed to purchase the bond. Samuels knew that his bond was being sold to the taxpayer.

Arthur Green, a member of the brokerage firm of Anderson, Plotz & Company, was a close personal friend of the taxpayer. For the reason that he was busily occupied otherwise, taxpayer requested Green to assist him in purchasing certain bonds. Green was furnished by the taxpayer with a list of bondholders and he subsequently made a number of purchases. All of such bondholders had previously talked to the taxpayer and some had been told by him to see Green, who was acting as his agent. Again, there is no question but that all the bondholders knew that Green was acting as agent of the taxpayer, that the bonds were being sold to the taxpayer and that the purchase price agreed upon was to be paid by the taxpayer.

As already noted, a decision as to whether the taxpayer realized a taxable gain by the purchase of bonds representing his personal indebtedness at less than their face value is dependent upon whether the situation is controlled by United States v. Kirby Lumber Co., supra, as argued by the Commissioner, or by Helvering v. American Dental Co., supra, as argued by the taxpayer. So much has been said and written concerning these two decisions of the Supreme Court, we realize our inability to elucidate further. In short, the only real distinction we are able to draw between these two cases is that in the Kirby case bonds representing the indebtedness were purchased by the debtor in the *open market,* while in the American Dental Company case notes with accrued interest and an open account representing the indebtedness were settled at a discount by the debtor dealing with his creditors. That the Kirby case is to be distinguished from the fact that the bonds were purchased in the open market is indicated in Helvering v. American Chicle Co., 291 U.S. 426, 54 S.Ct. 460, 78 L.Ed. 891. There, the Board of Tax Appeals, affirmed by the Court of Appeals (Commissioner v. American Chicle Co., 2 Cir., 65 F.2d 454), had denied the Commissioner's contention that corporate bonds purchased at less than their face value represented a gain to the taxpayer. The Supreme Court held otherwise under the authority of the Kirby case, and in so doing stated (291 U.S. page 430, 54 S.Ct. page 461): "During 1922, 1924, and 1925 it purchased a considerable number of these bonds in the market at less than their face."

In the Kirby case there were, of course, no negotiations between the debtor and its bondholders. Both treated the bonds merely as property to be sold or purchased on the open market. The bondholders could not have had any idea that they were selling to the debtor and thus forgiving part of their claim. The court did not consider the question of gratuitous cancellation of indebtedness and there was no occasion for it to do so for the reason that the bondholder, selling his bond on the open market, could not have intended to cancel any claim against the debtor. As far as the bondholder was concerned or had knowledge, the

claim remained outstanding in the hands of a new owner.

On the other hand, in the American Dental Company case the court was concerned with a situation where the debtor dealt directly with its creditors in settling its debts for less than their face value. Concerning this character of settlement, the court stated (318 U.S. page 330, 63 S.Ct. page 581, 87 L.Ed. 785):

"The release of interest or the complete satisfaction of an indebtedness by partial payment by the voluntary act of the creditor is more akin to a reduction of sale price than to financial betterment through the purchase by a debtor of its bonds in an armslength transaction. * * * The fact that the motives leading to the cancellations were those of business or even selfish, if it be true, is not significant. The foregiveness was gratuitous, a release of something to the debtor for nothing, and sufficient to make the cancellation here gifts within the statute."

The Court of Claims in Campau Realty Co. v. United States, Ct.Cl., 69 F.Supp. 133, page 134, referring to the American Dental Co. case, stated:

"In that case the court differentiated between a purchase of its bonds by a corporation on the open market and the purchase of them from the bondholders direct. In the latter case the Supreme Court held that the forgiveness of any part of a debt by a bondholder, without any consideration to him, was, of course, gratuitous and, therefore, a gift within the meaning of the statute, whether or not the motives leading to the forgiveness were of a business nature or selfish."

We have examined numerous cases cited and relied upon by the Commissioner which we find no reason for discussing. Some of them were decided prior to the American Dental Company case and others have no bearing upon a state of facts such as is here presented.

■ As to the bonds purchased by the taxpayer directly from the bondholders, including those purchased by the taxpayer's law partner, Nierman, we are of the view that such purchases come squarely within

the rationale of the American Dental Company case and that the difference between the face value of such bonds and the purchase price paid by the taxpayer does not represent taxable gain. To this extent we agree with the Tax Court.

We are of the view, however, that the Tax Court erred in its holding that the difference in the face value and the purchase price of the other bonds, that is, those purchased by the taxpayer either through his agent or an agent of the bondholder, represented taxable gain. As to this class of bonds, the Tax Court stated:

"It is petitioner's contention in the instant case that there was no open market for the sale of his bonds. It is true that there was no open market for the bonds in the sense that they were bought and sold on any securities exchange or in an over-the-counter market. However, the manner by which petitioner acquired a number of his bonds * * * is close akin to purchase in the open market, if indeed it does not properly fall within that sort of classification. As to these purchases the personal element we think necessary to make a gift within the meaning of the American Dental Co. case was absent."

We find ourselves in disagreement with this reasoning. In the first place, the fact that these bonds were purchased through an agent either of the taxpayer or the owner does not characterize them as open market transactions, if we understand the meaning of that term. As the Tax Court found, none of these bonds were listed or had a quoted price and nobody was buying them except the taxpayer, and we regard as immaterial under the circumstances heretofore related the fact that two of the agents employed were members of brokerage firms. Neither do we think that the personal relation of the parties was the important, and certainly it was not the controlling, element of the American Dental Company case. As we have shown, the important and we think controlling feature of that case is that the debtor was dealing with its creditors in such a manner that they parted with their security at less than its face value with knowledge that the amount received was in discharge of the debtor's obligation.

We also are of the view that it is of no consequence in the instant case that the taxpayer as to the purchase of some bonds dealt with his creditors through an agent rather than in a face to face transaction. These transactions are nevertheless direct in the sense that the taxpayer settled his debt with the person to whom it was owed, and, conversely, the creditor made settlement with his debtor and knowingly received from the latter the debtor's check in discharge of the debt. In contrast, if the taxpayer had purchased his bonds on the open market he in all probability would not have known who was the owner, and neither would the creditor, if his bond had been sold on the open market, have known whether its purchase was for the taxpayer or a stranger.

It seems to us that a differentiation between the situation where the debtor purchases his bond from a creditor in a face to face transaction and one where the debtor accomplishes the same purpose through an agent is a refinement too nebulous to be practical. What difference does it make whether the debtor performs the actual service himself or through his lawyer or the secretary of a bondholders' committee? In any event, the objective sought and the result accomplished is the same. And what difference can it make whether his creditor is a relative, an intimate friend, a casual acquaintance or even a stranger, providing such creditor when a settlement is made knows that it is being done with his debtor and that the debt is being paid for less than its face value and the remainder cancelled? In one instance as much as the other the cancellation amounts to a gratuitous forgiveness and a release of something to the debtor for nothing. To think otherwise is is to embrace the form and ignore the substance. As was said in Bowers, Collector v. Kerbaugh-Empire Co., 271 U.S. 170, 174, 46 S.Ct. 449, 451, 70 L.Ed. 886, "In determining what constitutes income substance rather than form is to be given controlling weight."

■ Lastly, the taxpayer contends that the Commissioner erroneously computed his deficiencies for the years 1939 and 1940 by failing to give him credit for the proper amount of entertainment expenses, in accordance with the decision of the Tax Court. While the record is somewhat confusing, it discloses the following situation. We shall refer to the year 1940, and the same situation exists as to the year 1939, with some variation in the figures.

The taxpayer originally claimed as deductible items on account of entertainment expense the amount of $2,264.54. The taxpayer substantiated this amount by documentary proof except $750, which is referred to as the non-recorded items or out-of-pocket expense. Of this $750, the Commissioner allowed $350.00 and disallowed $400.00. The Commissioner, therefore, allowed the taxpayer the total amount of $1,864.54 ($2,264.54 minus $400).

The issue presented to the Tax Court on this phase of the case, as shown by the taxpayer's petition and the statement of counsel for the Commissioner made at the commencement of the hearing before the Tax Court, was the alleged error of the Commissioner in disallowing automobile and entertainment expenses for the year 1940 in the amount of $750.55. This amount included the $400 disallowed by the Commissioner as entertainment expense, and $350.55 disallowed by the Commissioner as automobile expense.[1]

Thus, the sole issue before the Tax Court relative to personal entertainment expense was the $750 unrecorded item, and of this amount only $400 had been disallowed by the Commissioner. The amount of $1,864.54 previously allowed by the Commissioner was in no way involved in the proceeding

[1] The taxpayer showed an automobile expense of $1,051.66, and claimed that two-thirds of such amount, or $701.10, was expended in connection with his business. The Commissioner allowed one-third of such automobile expense, or $350.55, and disallowed one-third, or the same amount. It was this one-third disallowed by the Commissioner which was included in the $750.55 item of which the taxpayer complained before the Tax Court. That court allowed the taxpayer one-half of his automobile expense, or $525.83, which amount has been allowed in the Commissioner's final computation. It is, therefore, no longer in dispute and need not be again referred to.

before the Tax Court. That court found: "Petitioner expended at least $750.00 in each of the taxable years 1939 and 1940 in the entertainment of employees and clients and was not reimbursed therefor by the firm or by the clients. He kept no itemized account of these expenses." In its opinion the Tax Court refers to the taxpayer's testimony, which showed that he expended a much larger amount of which he had no record in each of these years, and stated: "However, he has testified at length about them and how and under what circumstances he made them and we are convinced that he expended at least $750.00 for these purposes and we have so found in our findings of fact." The Tax Court continues: "In a computation under Rule 50 the Commissioner should allow petitioner a deduction of a total of $750.00 in each of the taxable years 1939 and 1940 for these entertainment expenses." It is perfectly obvious, so we think, that what the Tax Court referred to both in its findings and opinion were the unrecorded items of expense claimed by the taxpayer. That must be so for there was no other issue before it. More specifically, what the Tax Court held was that the Commissioner had erroneously disallowed $400 of this item ($350 had been allowed by the Commissioner).

Now what did the Commissioner do in computing the taxpayer's deficiencies? On June 12, 1946, he filed a computation in which he allowed the taxpayer only $750 for entertainment expense in lieu of the $1,864.54 which had been originally allowed. In other words, after the taxpayer had won his point before the Tax Court he was allowed for entertainment expense $1,114.54 less than the amount the Commissioner had originally allowed him ($1,864.54 minus $750).

The taxpayer filed objections to the Commissioner's computation and on August 1, 1946, the Commissioner filed a revised computation in which he allowed as entertainment expense the amount of $1,864.54. This was the exact amount which the Commissioner had originally allowed, and failed to take into account the additional $400, which the Tax Court held the Commissioner had erroneously disallowed. In other words, on this revised computation the tax-

payer, after winning his point in the Tax Court, was relegated to the precise situation which he originally occupied. He had neither won nor lost by the decision of the Tax Court. It is, therefore, our opinion that he was entitled in the computation to an allowance of $2,264.54 for entertainment expenses for the year 1940 ($1,864.54 previously allowed by the Commissioner, plus $400 held by the Tax Court to have been erroneously disallowed by the Commissioner). On the same basis, his allowance for entertainment expenses for the year 1939 should be increased in the amount of $450.

The decision of the Tax Court is, therefore, in part affirmed and in part reversed and remanded, with directions to proceed in accordance with the views herein expressed.