## COMMISSIONER OF INTERNAL REVENUE *v.* JACOBSON.

Nos. 32 and 33.   Argued November 8, 1948.—Decided January 17, 1949.

*Arnold Raum* argued the cause for petitioner. With him on the brief were *Solicitor General Perlman, Assistant Attorney General Caudle, Ellis N. Slack, Lee A. Jackson, Hilbert P. Zarky, Morton K. Rothschild* and *Philip Elman.*

*Theodore R. Colborn* argued the cause for respondent. With him on the brief were *Wm. B. Cockley* and *Walter A. Marting.*

MR. JUSTICE BURTON delivered the opinion of the Court.

This decision applies the federal income tax to gains derived by a debtor from his purchase of his own obligations at a discount and his consequent control over their discharge. It presents the specific question whether a

30

solvent natural person, in straitened financial circumstances, must include in his gross income for federal income tax purposes the difference between (1) the face amount of his personal indebtedness as the maker of secured bonds, originally issued by him at face value for cash, and (2) a lesser amount paid by him for their purchase. The debtor's obligations were not unpaid balances of purchase prices which could be readjusted by the discharge of the obligations. The proceeds of the obligations were not traced into identifiable losses offsetting the debtor's realized gains from the discharge of these obligations. Each seller knew that the bonds he sold were being bought by or for the maker of them. In each sale the bondholder sought to minimize his probable loss by getting as much as possible, directly or indirectly, from the maker of the bonds as the one available purchaser of them. The maker of the bonds, at the same time, sought to reduce his obligations as much as possible by buying the bonds as cheaply as he could. While each seller thus knew that he was receiving from the maker of the bonds less than their face amount, there is no finding that any seller intended to transfer or release something for nothing or to make a gift of any part of his claim, as distinguished from making a sale and assignment of his whole claim for the highest available price. The maker thus realized a gain from each purchase and the Commissioner of Internal Revenue found correctly that, for federal income tax purposes, the maker must include that gain in his gross income for the tax year in which he made the purchase.

The respondent, Lewis F. Jacobson, in 1938, 1939 and 1940 resided, practiced law and owned or controlled substantial property interests in Chicago, Illinois. In 1943 the petitioner, Commissioner of Internal Revenue, found deficiencies in the income taxes paid by the respondent for

each of those years. Those deficiencies totaled $3,967.97, of which about $2,500 are now before us. This case arose from the Commissioner's addition to the reported gross income of the respondent of the differences between (1) the principal face amounts of certain leasehold bonds executed by the respondent and (2) the lesser amounts paid by him for their purchase. Such purchases were made by or for him substantially as follows:

| Date of purchase | Purchased D—Direct B—Through broker C—Through bondholders' committee | Principal face amount | Purchase price | Percentage of face amount paid by purchaser-maker-taxpayer |
|---|---|---|---|---|
| **1938** | | | | |
| Apr. 9, 1938 | D | $450.00 | $202.50 | 45 |
| June 9, 1938 | D | 3,600.00 | 1,620.00 | 45 |
| Aug. 17, 1938 | D | 900.00 | 405.00 | 45 |
| **1939** | | | | |
| Feb. 15, 1939 | B | 1,800.00 | 900.00 | 50 |
| June 16, 1939 | D | 450.00 | 225.00 | 50 |
| Oct. 23, 1939 | B | 180.00 | 86.50 | 48 |
| **1940** | | | | |
| Apr. 4, 1940 | C | 270.00 | 130.00 | 48 |
| May 21, 1940 | C | 450.00 | 210.00 | 47 |
| May 23, 1940 | C | 2,700.00 | 1,080.00 | 40 |
| June 19, 1940 | C | 1,800.00 | 720.00 | 40 |
| July 1, 1940 | B | 450.00 | 200.00 | 45 |
| July 3, 1940 | B | 450.00 | 200.00 | 45 |
| July 10, 1940 | B | 450.00 | 184.50 | 41 |
| Sept. 23, 1940 | B | 450.00 | 185.00 | 41 |
| Total | | $14,400.00 | $6,348.50 | |

Upon the respondent's petition, the Tax Court reviewed the Commissioner's findings and—

"*Held* that, as to the bonds acquired by petitioner [Jacobson, the respondent here] through direct negotiations with the bondholders, he is not taxable on the gain therefrom under the doctrine of *Helvering* v. *American Dental Co.*, 318 U. S. 322; *held, further,* that petitioner is taxable on the gain realized

in the purchases from bondholders through the secretary of the bondholders' committee and the security dealers, under the doctrine of the Supreme Court in *United States v. Kirby Lumber Co.,* 284 U. S. 1, he being at all times solvent." 6 T. C. 1048.

Six of the sixteen judges dissented and five of those six voted to uphold the Commissioner completely, on the ground that none of the transactions were gratuitous. 6 T. C. 1048, 1057–1059. The Commissioner petitioned the Court of Appeals for the Seventh Circuit to review that part of the judgment which was unfavorable to him. The respondent did the same as to the remainder of the judgment. That court decided against the Commissioner on both petitions. It held that, because the respective sellers knew that the bonds they sold were being bought by or for the respondent, as the maker of them, any excess of the face values of the bonds over their sales prices should be treated as gifts to the respondent and as exempt from income tax. 164 F. 2d 594. Due to the importance of the issues in the unsettled field of the taxability of gains derived by a debtor from his discharge of his own obligations at a discount, we granted certiorari in both cases. 333 U. S. 866. We have heard and decided them together.

The further material facts, as found by the Tax Court or as shown by undisputed evidence, are as follows:

By purchases made in 1922 and 1923 the respondent acquired a 99-year lease, running from May 1, 1914, together with a two-story store, office and apartment building on the leased premises in Chicago. On or about May 1, 1925, he borrowed $90,000 from a nearby bank and, together with his wife, executed in return 200 bonds secured by a trust deed mortgaging to that bank the leasehold and the improvements thereon. The bonds bore interest at 6½ per cent per annum and were for

the total principal amount of $90,000, with $2,500 maturing semiannually up to and including November 1, 1931. The balance of the bonds, totalling $57,500, were to mature May 1, 1932. The original proceeds were used by the respondent to retire the existing encumbrance, of an undisclosed amount, on the property, pay for a $16,250 addition made by him to the building on the leasehold and pay the necessary brokerage commission of approximately 10 per cent of the loan, plus the cost of printing the bonds and other expenses in connection with the loan. A remaining "small surplus" was paid to the respondent. In 1925 the respondent, for the purposes of computing depreciation, allocated $76,580.56 to the improvements, including the new addition, and $40,000 to the leasehold, out of their total cost to him of $116,580.56.

The bonds due on or before November 1, 1931, were paid at or about their maturities. The debtor has never been in default on any interest payment. However, after the trustee bank closed on June 8, 1931, a committee was formed to represent the holders of this issue of bonds. May 1, 1932, the respondent secured from the committee and individual bondholders a five-year extension of the maturity on all of the bonds and a reduction in the interest rate from $6\frac{1}{2}$ to 5 per cent. During this extension the respondent issued his checks in the names of the respective bondholders to cover interest due them. The checks were delivered by the secretary of the bondholders' committee, the respondent kept himself fully informed as to the identity and location of the respective bondholders and they, in turn, frequently visited him to learn about his financial condition and that of the trusteed property. In 1937 he procured a further extension of the maturity of the bonds to May 1, 1942, and, in that connection, paid 10 per cent on

the principal of each bond, leaving a total outstanding balance of $51,750 payable on these bonds.

The Tax Court found that in 1938 the fair market value of the leasehold and the improvements thereon was $80,000 and that in 1939 and 1940 it was the same, less accrued depreciation. The respondent testified that he valued it at considerably less, even as low as twice the amount of its gross income, or about $32,000. The gross and net income from the trusteed property, after deduction of expenses, depreciation and also the interest on the bonds, was:

| Year | Gross income | Net income |
|------|-------------|------------|
| 1938 | $16,550.00 | $1,233.95 |
| 1939 | 16,520.75 | 1,107.11 |
| 1940 | 15,578.50 | 1,719.41 |

The respondent received from his law practice and other sources the following additional gross income: 1938, $38,390.85; 1939, $35,644.78; and 1940, $35,279.59. The Tax Court said that: "On the strength of the showing of petitioner's assets and liabilities, we find petitioner was solvent during each of the taxable years 1938, 1939, and 1940." 6 T. C. at p. 1053. The Court of Appeals said: "The Tax Court found that the taxpayer was solvent during each of the taxable years 1938, 1939 and 1940, and we accept the finding, although a perusal of the record makes it quite apparent that he was in straitened financial circumstances." 164 F. 2d at p. 596.

In his petition to the Tax Court the respondent stated, and it has not been disputed, that the value of the leasehold and building had sharply depreciated since his acquisition of them. The neighborhood had changed, stores were vacant or paid less than half of their previous rents, from 1932 to 1938 the value of the property was substantially less than its cost to him, conditions were

getting worse and he felt certain that he would sustain a large loss in connection with the property.[1]

The Tax Court's findings describe each bond sale that is material. Some were to the respondent personally and some to his law partner, acting on his behalf. The rest were made indirectly to the respondent through brokers or through the bondholders' committee. The Tax Court said that each sale that was made through a broker or

---

[1] In his petition to the Tax Court, the respondent, in describing the sale of bonds to him at a discount in 1939, said:

"It was self interest and good business judgment exercised by all prudent persons to take cash settlements, when otherwise greater losses might be incurred. I have done that very thing myself, and have advised clients to do so in similar circumstances. Most real estate bonds in Chicago were selling from 5c to 25c on the dollar in 1932 to 1940."

In the instant case the respondent was found to have been solvent before, as well as after, his realization of the gains in question. The payment of the bonds purchased by him was secured by the mortgage of his leasehold property which property had a fair market value substantially in excess of the face amount of the bonds. The record fails to establish any sufficient basis for a claim that the respondent had suffered losses which, for tax purposes, offset his gains from his purchase of the bonds. Little of the $90,000 originally received by him for the bonds was used to purchase property. There is no finding or substantial evidence showing specifically how those funds were invested. Even if they are traced, in part, into the addition made to the building on the leasehold premises and into the discharge of the then existing encumbrance on those premises, the total so used is not shown and the shrinkage in the value of those investments is not clearly ascertained in the taxable years in question. The ratio of the loss in value of the leasehold property indicated by the Tax Court findings is about 32 per cent of its cost in 1925 but this loss is merely based upon estimates. The respondent claims a larger shrinkage but there is not a sufficient ascertainment of it to permit consideration of its use as an offset to the respondent's gains in 1938, 1939 or 1940. See 2 Mertens, Law of Federal Income Taxation, § 11.20 and n. 99 (1942).

36

the committee was closely akin to an open market transaction. It made no finding that any seller intended to transfer or release something for nothing. It referred to all of the respondent's acquisitions of bonds as purchases. Apparently the bonds were payable to bearer and the Tax Court referred to them as negotiable bonds. Each seller made a complete transfer to the respondent of all the seller's rights to or under the bonds. Each seller thus determined the amount of his own loss on his investment. Each knew that the maker of the bond would acquire or secure control over it and would thus be enabled to reduce his liabilities by its face amount. Except for the 10 per cent paid on each bond in 1937, there is no evidence that any bondholder at any time received any partial payment on any bond or consented to a reduction of the indebtedness evidenced by the bond. There is no suggestion that any of the respondent's payments made in 1938, 1939 or 1940 were made specifically in partial reduction of the respondent's obligation as evidenced by a bond or that any bondholder specifically discharged him from any part of the balance of that obligation. On the other hand, it does appear that each of such payments was made in consideration of the transfer to the respondent of title to the entire bond. Each bond was delivered to the respondent evidencing his obligation for its full original face amount, less only the 10 per cent payment made, on account, in 1937. At the time of the trial, the respondent apparently still held the purchased bonds "intact." The Court of Appeals repudiated any distinction made by the Tax Court for present purposes between the direct and indirect sales to the respondent. The Court of Appeals based its decision on each seller's knowledge that he was transferring his bond to the maker of it. Thus far we agree. The Court of Appeals, however, without any finding of intent by the respective sellers to transfer or release something

for nothing, as distinguished from an intent to get the highest available price for their entire claims, treated the respondent's gain from each purchase as exempt from the taxation imposed by § 22 (a) of the Revenue Act of 1938 [2] and of the Internal Revenue Code, because that court felt itself obliged by precedent to classify each such gain as a "gift" under § 22 (b) (3) of that Act [3] and Code. We hold, however, that those Sections do not, in the light of the decisions of this Court, permit that result.

[2] "SEC. 22. GROSS INCOME.

"(a) GENERAL DEFINITION.—'Gross income' includes gains, profits, and income derived from salaries, wages, or compensation for personal service, of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. . . ." 52 Stat. 457.

This was re-enacted as § 22 (a), I. R. C., 53 Stat. 9, and amended in a manner not material here in 53 Stat. 574–575, 26 U. S. C. (1940 ed.) § 22 (a). The Revenue Act of 1938 applied to the respondent's income in 1938 and the Internal Revenue Code to that in 1939 and 1940.

[3] "SEC. 22. GROSS INCOME.

.          .          .          .          .

"(b) EXCLUSIONS FROM GROSS INCOME.—The following items shall not be included in gross income and shall be exempt from taxation under this title:

.          .          .          .          .

"(3) GIFTS, BEQUESTS, AND DEVISES.—The value of property acquired by gift, bequest, devise, or inheritance (but the income from such property shall be included in gross income) ;"

.          .          .          .          .

52 Stat. 458.

This was re-enacted as § 22 (b) (3), I. R. C., 53 Stat. 10, 26 U. S. C. (1940 ed.) § 22 (b) (3), without material change.

The first test of the taxability of such gains relates to their inclusion within the gross income of the taxpayer under § 22 (a), without reference to the specific exclusions made from it by § 22 (b). The other test consists of the application to such gains of any of those specific exclusions. We hold that these gains come within § 22 (a) but not within any of the exclusions from gross income stated in § 22 (b).

The respondent realized an immediate financial gain from his purchase of these bonds at a discount. By that acquisition he was enabled, at will, to cancel them and thus discharge himself from liability to pay them. While the record indicates that he held them "intact," apparently without crediting released indebtedness on them or otherwise physically cancelling them in whole or in part (except for the 10 per cent payments made by him on each bond in 1937), his possession of them and control over them is not disputed and the petitioner has properly treated their acquisition as constituting a reduction of the respondent's debts to the extent of their face amount. At the time of their purchase the respondent was unconditionally and primarily bound to pay their face amounts on May 1, 1942, with interest. Although in straitened financial circumstances he was solvent, both before and after his acquisition of the bonds, and the bonds apparently were collectible from him in full through appropriate enforcement proceedings. His acquisition, and consequent control over the discharge of these bonds, therefore, improved his net worth by the difference between their face amount and the price he paid for them. It also relieved him of the semiannual interest payments on them of 5 per cent per annum. His acquisition of them likewise reduced the face amount of the lien held by others upon his leasehold property. In the first instance he had received the full face amount in cash for these bonds so that his repurchase of them for 50 per

cent, or less, of that amount reflected a substantial benefit which he had derived from the use of that borrowed money.[4] These were not purchase money bonds. The gains from their cancellation were not akin to reductions in balances due on the prices of previously acquired property. The respective sellers of the bonds bore no relation to the respondent other than that of creditors. The gains derived by the respondent through these purchases were comparable to those he would have realized if he had purchased, at the same discount, like bonds issued by a third party and had resold them at full face value or had turned them in at full value as a credit upon some other indebtedness of the respondent. His gains were comparable in their nature to those which he would have realized if a third party, pursuant to a contract, had paid off his indebtedness on these bonds for him to the extent of the discount at which he purchased them.[5] The nature

    [4] See note 1, *supra,* showing the varied uses to which the respondent applied these proceeds and showing that it is not practicable in this case to determine his losses from his resulting investments, and much less to offset them against his gains now at issue. His tax benefits from those losses are thus postponed until some such occasion as the sale of the properties reflecting them makes it possible to ascertain the losses clearly.
    [5] Such discharges of a taxpayer's debts by payments made for his benefit are realizable income to him. In *Douglas* v. *Willcuts,* 296 U. S. 1, 9, this Court said:
    "The question is one of statutory construction. We think that the definitions of gross income (Revenue Acts, 1926, § 213; 1928, § 22) are broad enough to cover income of that description. They are to be considered in the light of the evident intent of the Congress 'to use its power to the full extent.' *Irwin* v. *Gavit,* 268 U. S. 161; *Helvering* v. *Stockholms Bank,* 293 U. S. 84, 89. We have held that income was received by a taxpayer, when, pursuant to a contract, a debt or other obligation was discharged by another for his benefit. The transaction was regarded as being the same in substance as if the money had been paid to the taxpayer and he had transmitted it to his creditor. *Old Colony Trust Co.* v. *Commissioner,* 279 U. S. 716; *United States* v. *Boston & Maine Railroad,* 279 U. S. 732."

of the gain derived by a debtor from his purchase of his own obligations at a discount is the same whether the debtor is a corporation or a natural person. That such a gain comes within the meaning of gross income as used in federal income tax laws was long ago recognized by the Treasury Department's Regulations and by this Court in the leading cases in this field.[6] *United States* v. *Kirby Lumber Co.,* 284 U. S. 1; *Helvering* v. *American Chicle Co.,* 291 U. S. 426. Similar provisions appeared in the Regulations in effect in 1938–1940.[7]

---

[6] ". . . By the Revenue Act of (November 23,) 1921, c. 136, § 213 (a) gross income includes 'gains or profits and income derived from any source whatever,' and by the Treasury Regulations authorized by § 1303, that have been in force through repeated reënactments, 'If the corporation purchases and retires any of such bonds at a price less than the issuing price or face value, the excess of the issuing price or face value over the purchase price is gain or income for the taxable year.' Article 545 (1) (c) of Regulations 62, under Revenue Act of 1921. See Article 544 (1) (c) of Regulations 45, under Revenue Act of 1918; Article 545 (1) (c) of Regulations 65, under Revenue Act of 1924; Article 545 (1) (c) of Regulations 69, under Revenue Act of 1926; Article 68 (1) (c) of Regulations 74, under Revenue Act of 1928. We see no reason why the Regulations should not be accepted as a correct statement of the law.

". . . The defendant in error has realized within the year an accession to income, if we take words in their plain popular meaning, as they should be taken here." *United States* v. *Kirby Lumber Co.,* 284 U. S. 1, 2–3.

[7] "ART. 22 (a)–14. CANCELLATION OF INDEBTEDNESS.—(a) *In general.*—The cancellation of indebtedness, in whole or in part, may result in the realization of income. If, for example, an individual performs services for a creditor, who in consideration thereof cancels the debt, income in the amount of the debt is realized by the debtor as compensation for his services. A taxpayer realizes income by the payment or purchase of his obligations at less than their face value. . . .

.　　　.　　　.　　　.　　　.

"ART. 22 (a)–18. SALE AND PURCHASE BY CORPORATION OF ITS BONDS.—(1) (a) If bonds are issued by a corporation at their face

If § 22 (a) stood alone, without the exclusions stated in § 22 (b), the gain realized by the respondent in this case unquestionably would constitute gross income for income tax purposes. The provisions of § 22 (b) and the decisions of this Court do not change that result. On the contrary, they confirm it.

A striking demonstration of the meaning given by Congress to § 22 (a) appears in its Amendments to § 22 (b) of the Internal Revenue Code by the Revenue Act of 1939, c. 247, 53 Stat. 862, approved June 29, 1939.[8] These Amendments then applied only to taxable years beginning after December 31, 1938, and only to discharges of indebtedness occurring on or after June 29, 1939. The value of these Amendments for the purposes of the instant case is not so much in the exclusions which

---

value, the corporation realizes no gain or loss. (*b*) If the corporation purchases any of such bonds at a price in excess of the issuing price or face value, the excess of the purchase price over the issuing price or face value is a deductible expense for the taxable year. (*c*) If, however, the corporation purchases any of such bonds at a price less than the issuing price or face value, the excess of the issuing price or face value over the purchase price is gain or income for the taxable year." Treasury Regulations 101, promulgated under the Revenue Act of 1938.

In Treasury Regulations 103, promulgated under the Internal Revenue Code, §§ 19.22 (a)–14 and 19.22 (a)–18 were identical with the above. Even today they are the same in Treasury Regulations 111, promulgated under the Internal Revenue. Code, as §§ 29.22 (a)–13 and 29.22 (a)–17.

[8] These Amendments are contained in § 215 of the Internal Revenue Act of 1939, c. 247, 53 Stat. 862, 875–876, 26 U. S. C. (1940 ed.) §§ 22 (b) (9), 113 (b) (3). They added to the Internal Revenue Code § 22 (b) (9) and § 113 (b) (3), both relating to the discharge of indebtedness. A cross reference is made to the latter in the former. Such § 215, in its entirety, is as follows:

"SEC. 215. DISCHARGE OF INDEBTEDNESS.

"(a) INCOME FROM DISCHARGE OF INDEBTEDNESS.—Section 22 (b) of the Internal Revenue Code (relating to exclusions from gross

they prescribe, as in the clear light which their own limitations shed upon §§ 22 (a) and 22 (b) to the extent that those Sections remain unchanged.

Unless those Sections as they stood in 1938 meant that the gains derived by a debtor corporation from its purchases of its own obligations at a discount resulted in gross income under § 22 (a), there was no need for these 1939 Amendments. Furthermore, as the status of

---

income) is amended by adding at the end thereof the following new paragraph:

"(9) INCOME FROM DISCHARGE OF INDEBTEDNESS.—In the case of a corporation, the amount of any income of the taxpayer attributable to the discharge, within the taxable year, of any indebtedness of the taxpayer or for which the taxpayer is liable evidenced by a security (as hereinafter in this paragraph defined) if—

(A) it is established to the satisfaction of the Commissioner, or

(B) it is certified to the Commissioner by any Federal agency authorized to make loans on behalf of the United States to such corporation or by any Federal agency authorized to exercise regulatory power over such corporation,

that at the time of such discharge the taxpayer was in an unsound financial condition, and if the taxpayer makes and files at the time of filing the return, in such manner as the Commissioner, with the approval of the Secretary, by regulations prescribes, its consent to the regulations prescribed under section 113 (b) (3) then in effect. In such case the amount of any income of the taxpayer attributable to any unamortized premium (computed as of the first day of the taxable year in which such discharge occurred) with respect to such indebtedness shall not be included in gross income and the amount of the deduction attributable to any unamortized discount (computed as of the first day of the taxable year in which such discharge occurred) with respect to such indebtedness shall not be allowed as a deduction. As used in this paragraph the term 'security' means any bond, debenture, note, or certificate, or other evidence of indebtedness, issued by any corporation, in existence on June 1, 1939. This paragraph shall not apply to any discharge occur-

natural persons and corporations is not differentiated in § 22 (a), the new Amendments make it equally clear that, inasmuch as they relieve only certain corporations from the taxability of gains derived from their purchases of their own obligations at a discount, it must be that similar gains derived by natural persons also remain taxable under § 22 (a). The strength of this reflection of the

ring before the date of the enactment of the Revenue Act of 1939, or in a taxable year beginning after December 31, 1942.

"(b) BASIS REDUCED.—Section 113 (b) of the Internal Revenue Code (relating to the adjusted basis of property) is amended by adding at the end thereof the following new paragraph:

"(3) DISCHARGE OF INDEBTEDNESS.—Where in the case of a corporation any amount is excluded from gross income under section 22 (b) (9) on account of the discharge of indebtedness the whole or a part of the amount so excluded from gross income shall be applied in reduction of the basis of any property held (whether before or after the time of the discharge) by the taxpayer during any portion of the taxable year in which such discharge occurred. The amount to be so applied (not in excess of the amount so excluded from gross income, reduced by the amount of any deduction disallowed under section 22 (b) (9)) and the particular properties to which the reduction shall be allocated, shall be determined under regulations (prescribed by the Commissioner with the approval of the Secretary) in effect at the time of the filing of the consent by the taxpayer referred to in section 22 (b) (9). The reduction shall be made as of the first day of the taxable year in which the discharge occurred except in the case of property not held by the taxpayer on such first day, in which case it shall take effect as of the time the holding of the taxpayer began.

"(c) TAXABLE YEARS TO WHICH APPLICABLE.—The amendments made by this section shall be applicable to taxable years beginning after December 31, 1938." 53 Stat. 875–876.

See also, Treasury Regulations 103, promulgated under the Internal Revenue Code: § 19.22 (b) (9)–1, Income from discharge of indebtedness; § 19.22 (b) (9)–2, Making and filing of consent; § 19.113 (b) (3)–1, Adjusted basis: Discharge of corporate indebtedness: General rule; § 19.113 (b) (3)–2, Adjusted basis: Discharge of corporate indebtedness: Special cases.

44

Amendments upon the unamended Sections is emphasized by their temporary character. The Amendments expressly provide that they shall not apply to a taxable year beginning after December 31, 1942. This indicates that, for its permanent program, Congress regarded such gains as properly taxable and it indicates that the Amendments were intended to authorize temporary changes in policy and were not clarifications of existing or continuing tax policies. While the time limit originally prescribed has been subsequently extended, the extensions have been made by separate Acts, each for a period of one to three years.[9] This repeated emphasis upon their temporary character increases the contrast which they make with the permanent policy of Congress as to the general taxability of this kind of gains under § 22 (a).

These Amendments describe gains corresponding almost precisely with those derived by the respondent from his transactions in the instant case but the Amendments apply only to corporate gains. They thus indicate that such gains were recognized as not having been excluded from gross income by § 22 (b) (3) or by any other Section. If they had been so excluded there would have been no need for the new Amendments to exclude those which they did, even temporarily. Furthermore, those gains are not excluded from gross income for all purposes of the income tax laws. Section 22 (b) (9) excludes them only from the ordinary income taxes for the taxable year in which the taxpaying corporation purchases its own securities at a discount.[10] Furthermore, the exclusion under

---

[9] While § 22 (b) (9) originally did not apply to any discharge occurring in a taxable year beginning after December 31, 1942, 53 Stat. 875, this date was changed to December 31, 1945, 56 Stat. 811; December 31, 1946, 59 Stat. 574; December 31, 1947, 60 Stat. 749; and December 31, 1949, 61 Stat. 179.

[10] The exclusions made by § 22 (b) apply to the taxes imposed by the Income Tax Chapter of the Internal Revenue Code. These

§ 22 (b) (9), as distinguished from other exclusions under § 22 (b), is available only upon the express condition that the taxpayer makes and files at the time of filing the return its consent to the Regulations [11] prescribed under § 113 (b) (3)[12] then in effect. That Section and such Regulations require that, where any amount is excluded by a corporation from its gross income under § 22 (b) (9) on account of its discharge of its own indebtedness, the whole or a part of such amount shall be applied to the reduction of the basis of property held by the taxpayer during any portion of the taxable year in which such discharge occurs. The amount to be so applied and the properties to which the reduction shall be allocated are to be determined by Regulations approved by the Secretary of the Treasury. This means that such a gain,

---

include the ordinary income taxes but not the additional income taxes such as those imposed on personal holding companies or the excess-profits taxes.

[11] Treasury Regulations 103, *supra*, §§ 19.113 (b) (3)–1 and 2 cover the subject. They provide a comprehensive procedure for decreasing the cost or other basis of a taxpaying corporation's properties as a condition of its taking advantage of § 22 (b) (9). This procedure applies not only in "the case of indebtedness incurred to purchase specific property" but also in "the case of specific property (other than inventory or notes or accounts receivable) against which, at the time of the discharge of the indebtedness, there is a lien (other than a lien securing indebtedness incurred to purchase such property) . . . ." It even provides that if any excess of amount excluded from gross income under § 22 (b) (9) exceeds those two adjustments, the cost or other basis of all the property of the debtor other than inventory and notes and accounts receivable shall be reduced proportionately and, finally, the balance, if any, of the amount excluded from the debtor's gross income is applied to the reduction of the cost or other basis of the debtor's inventory or notes or accounts receivable. It thus offers affirmatively a broad alternative plan for reaching the corporate debtor's gains from its discharge of its indebtedness at a discount.

[12] See note 8, *supra*.

instead of being completely excluded as exempt from taxation, is postponed, for income tax purposes, until a later date when the property is disposed of in a way which will permit another form of ascertainment of the taxpayer's gain or loss in its disposition.[13] These provisions therefore demonstrate that Congress, at least since 1939, has prescribed that, in order for a corporate taxpayer to exclude from its gross income under § 22 (a) certain gains attributable to the discharge within the taxable year of the taxpayer's indebtedness evidenced by bonds, the taxpayer must consent to the subsequent use of those gains in reducing the basis of property held by the taxpayer during any portion of the taxable year in which such discharge occurred. A corporate taxpayer with gains meeting these specifications but not filing the required consent would be obliged to include those gains in its gross income, unless additional facts brought them

---

[13] Subsequent Amendments have altered these provisions but have not changed their general effect nor their reflection upon the meaning of § 22 (a). For the extension of the temporary nature of the provisions, see note 9, *supra*. The requirement of a specially certified "unsound financial condition" for a corporate taxpayer in order to make § 22 (b) (9) applicable was eliminated by the Revenue Act of 1942. That Act also eliminated the limitation to securities in existence on June 1, 1939. 56 Stat. 811.

In making these temporary provisions Congress had in mind especially the conditions presented by railroads and other corporations then seeking to liquidate heavy indebtedness. The Committees reporting the bills for passage emphasized the limitations that were imposed by these Amendments upon corporations seeking to exclude from taxable income the gains derived from their acquisition of their own securities at a discount. H. R. Rep. No. 855, 76th Cong., 1st Sess. 5, 23–25 (1939); Sen. Rep. No. 648, 76th Cong., 1st Sess. 2–3, 5 (1939). Obviously it was expected that these provisions would decrease the existing burdens of income taxation. It certainly was not intended to impose a burden of postponed taxability upon gains which otherwise would have been completely exempted from taxation by § 22 (b) (3).

under some other exemption. *A fortiori*, a natural person, such as the respondent in the instant case, who has derived gains precisely within these specifications but who, as a natural person, is ineligible to file the required consent is obliged to include those gains in his gross income under § 22 (a). It remains, therefore, to consider whether there are facts in this case which bring this respondent's transactions within any exclusion other than that stated in § 22 (b) (9).[14]

The only provision for the exclusion of these types of gains from the respondent's gross income that is presented for our consideration is the general exemption of

---

[14] Several provisions have extended comparable relief to other taxpayers. None of them apply to the respondent. They emphasize, however, the understanding of Congress that, without special provision for their exclusion, the gains of a taxpayer from the discharge of his indebtedness at a discount are required by § 22 (a) to be included in his gross income. They recognize that the mere exclusion of "gifts" under § 22 (b) (3) is not enough to cover factual situations like those presented in § 22 (b) (9) or in the other relief provisions above mentioned.

Among these relief provisions are the following:

Exclusion, from excess profits credit, of income derived from the retirement or discharge by the taxpayer of the taxpayer's own obligations if they have been outstanding more than 18 months. Internal Revenue Code, §§ 711 (a) (1) (C), 711 (a) (2) (E), and § 711 (b) (1) (C) added by the Second Revenue Act of 1940, c. 757, 54 Stat. 976–978, repealed by the Revenue Act of 1945, c. 453, 59 Stat. 568.

Exclusion, from gross income, for income tax purposes, of the income of railroad corporations attributable to their discharge of their indebtedness to the extent realized from a modification or cancellation of indebtedness, pursuant to an order of court. Internal Revenue Code, § 22 (b) (10), added by the Revenue Act of 1942, c. 619, 56 Stat. 812, applicable to taxable years beginning after December 31, 1939, but not applicable to any discharge in a taxable year beginning after December 31, 1945; this latter date extended to December 31, 1946, 59 Stat. 574; December 31, 1947, 60 Stat. 749; and December 31, 1949, 61 Stat. 179.

gifts from taxation prescribed by § 22 (b) (3).[15]   This was applied by this Court in favor of a taxpayer in *Helvering* v. *American Dental Co.*, 318 U. S. 322, as well as by the court below in the instant case.   Both the general provision for taxation of income and this provision for the exclusion of gifts from gross income, for income tax purposes, have been in the Federal Income Tax Acts in substantially their present form since the Revenue Act of 1916.[16]   The contrast between the provi-

---

[15] See note 3, *supra*.

[16] "Sɛc. 2. (a) That, subject only to such exemptions and deductions as are hereinafter allowed, the net income of a taxable person shall include gains, profits, and income derived from salaries, wages, or compensation for personal service of whatever kind and in whatever form paid, or from professions, vocations, businesses, trade, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in real or personal property, also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever: . . . .

.        .        .        .        .

"Sɛc. 4. The following income shall be exempt from the provisions of this title [Title I.—Income Tax]:

"The proceeds of life insurance policies paid to individual beneficiaries upon the death of the insured; the amount received by the insured, as a return of premium or premiums paid by him under life insurance, endowment, or annuity contracts, either during the term or at the maturity of the term mentioned in the contract or upon the surrender of the contract; *the value of property acquired by gift, bequest, devise, or descent (but the income from such property shall be included as income)*; interest upon the obligations of a State or any political subdivision thereof or upon the obligations of the United States or its possessions or securities issued under the provisions of the Federal farm loan Act of July seventeenth, nineteen hundred and sixteen; the compensation of the present President of the United States during the term for which he has been elected, and the judges of the Supreme and inferior courts of the United States now in office, and the compensation of all officers and employees of a State, or any political subdivision thereof, except when

sions is striking. The income taxed is described in sweeping terms and should be broadly construed in accordance with an obvious purpose to tax income comprehensively. The exemptions, on the other hand, are specifically stated and should be construed with restraint in the light of the same policy. Congress could have excluded from the gross income of all taxpayers the gains derived by debtors either from their acquisitions of their own obligations at a discount and their consequent control over them, or from their respective releases from all or part of such obligations by their respective creditors upon the debtor's payment to the creditor of something less than the full amount of the debt. Congress, especially since the Revenue Act of 1938, has been cognizant of this issue and of its power to meet it as stated, but it has chosen to extend such relief only on the above described restricted and temporary basis and only in the case of corporations. In its treatment of the issue Congress also has required the corporate taxpayer's consent to an alternative plan for a reduction of the corporation's basis of property values to be used in later determinations of its gains or losses. This special treatment is far different from the total exclusion of a gain resulting from an exempt gift. If such gains were already exempted as gifts under § 22 (b) (3), as representing something transferred to the debtor for nothing, there would have been no need for § 22 (b) (9). The conclusion to be drawn is that such transfers as are described in § 22 (b) (9) could not, without more, qualify as exempt gifts under § 22 (b) (3). The same may be said of the acquisition, by a natural person, of his own obligations as debtor. The facts in the instant case pre-

---

such compensation is paid by the United States Government." (Italics supplied.) Revenue Act of 1916, c. 463, 39 Stat. 756, 757, 758–759. See also, An Act To reduce tariff duties and to provide revenue for the Government, and for other purposes. (October 3, 1913.) 38 Stat. 114, 167, § II B.

sent a situation quite similar to one contemplated by § 22 (b) (9) except that the taxpayer here is a natural person. This emphasizes the taxability of the gains before us.

In the instant case the relation between the bondholder and the respondent may be assumed in each transaction to have been one in which the ultimate parties were known to each other to be such. There was no suggestion in the evidence or the findings that any bondholder was acting from any interest other than his own. Each transaction was a sale. The seller sought to get as high a price as he could for the bond and the buyer sought to pay as low a price as he could for the same bond. If the transaction had been completely on the open market through a stock exchange, the conduct and intent of each party could have been the same and there would have been little, if any, basis for any claim that the respondent's gain was not taxable income. The mere fact that the seller knew that he was selling to the maker of the bond as his only available market did not change the sale into a gift. In the absence of proof to the contrary, the intent of the seller may be assumed to have been to get all he could for his entire claim. Although the sales price was less than the face of the bond and less than the original issuing price of the bond, there was nothing to indicate that the seller was not getting all that he could for all that he had. There is nothing in the evidence or findings to indicate that he intended to transfer or did transfer something for nothing. The form of the transaction emphasized this relationship. The seller assigned the entire bond to his purchaser. The seller did not first release the maker from a part of the maker's obligation and, having made the maker a gift of that release, then sell him the balance of the bond or vice versa. If the seller actually had intended to give the maker some gift the natural reflection of that gift would have been a credit on the face of the bond or at least some record or

testimony evidencing the release.   This is not saying that the form of the transaction is conclusive.   Assuming that the extension of the maturity of the bonds in the instant case was binding on the creditor, we do not rest this case upon the fact that the sale was made before maturity or that the seller may have received valid consideration for a total release of his claim because the debtor's payment was made before maturity.   It is quite possible that a bondholder might make a gift of an entire bond to anyone, including the maker of it.   The facts and findings in this case do not establish any such intent of the seller to make a gift in contradiction of the natural implications arising from the sales and assignments which he made.   It is conceivable, although hardly likely, that a bondholder, in the ordinary course of business and without any express release of his debtor, might have sold part of his claims on the bonds he held at the full face value of those parts and then have made a gift of the rest of his claims on those bonds to the same debtor "for nothing."   It is that kind of extraordinary transaction that the respondent asks us, as a matter of law, to read into the simple sales which actually took place and from which he derived financial gains.   We are unable to do so on the findings before us.   Cf. *Bogardus* v. *Commissioner,* 302 U. S. 34.

The situation in each transaction is a factual one.   It turns upon whether the transaction is in fact a transfer of something for the best price available or is a transfer or release of only a part of a claim for cash and of the balance "for nothing."   The latter situation is more likely to arise in connection with a release of an open account for rent or for interest, as was found to have occurred in *Helvering* v. *American Dental Co., supra,* than in the sale of outstanding securities, either of a corporation as described in § 22 (b) (9), or of a natural person as presented in this case. For these reasons we hold that the Commissioner was

justified in finding a taxable gain, rather than an exempt gift, in each of the transactions before us. The judgment of the Court of Appeals accordingly is reversed and the cause is remanded for further action in accordance with this opinion.

*It is so ordered.*

Mr. Justice Rutledge, although joining in the Court's judgment and opinion, is of the view that the result is essentially in conflict with that reached in *Helvering* v. *American Dental Co.,* 318 U. S. 322.

Mr. Justice Reed, with whom Mr. Justice Douglas joins, dissenting.

As detailed in *Helvering* v. *American Dental Company,* 318 U. S. 322, the problems of the tax results to the debtor of the release of indebtedness have been difficult. That opinion shows that both Congress and Internal Revenue Regulations have taken varying views as to whether a taxpayer should pay an income tax on such balance sheet improvements.[1]

We held in the *American Dental* case in 1943 that the "receipt of financial advantages gratuitously" was a gift under Int. Rev. Code § 22. Congress has made no change in the law since that time, nor has it been requested to do so. For the reasons discussed at length in that case, we are of the opinion that the judgment of the Court of Appeals should be affirmed.

---

[1] *Helvering* v. *American Dental Co., supra,* p. 326, note 5; p. 328, note 9, particularly tax free railroad adjustments under c. XV, § 735, 53 Stat. 1140.