**NEW YORK CREDIT MEN'S ADJUSTMENT BUREAU, Inc. v. UNITED STATES.**

United States District Court
S. D. New York.
Jan. 8, 1953.

Engelson & Burstein, New York City (David M. Engelson, New York City, of counsel), for plaintiff.

Myles J. Lane, U. S. Atty., New York City, Lawrence G. Greene, Ass't U. S. Atty., New York City, of counsel), for defendant.

RYAN, District Judge.

This suit at law was filed by Stor-Aid, Inc., on December 18, 1947 under the provisions of Title 28 U.S.C.A. Sec. 41(20)[1] for the recovery of $7,990.63 paid under protest by Stor-Aid on account of additional excess profits and income taxes alleged by Stor-Aid to have been erroneously or illegally assessed and collected for its fiscal year ending August 31, 1943.

Since the filing of this suit, Stor-Aid has been adjudicated a bankrupt in this court and the plaintiff has been duly elected and has qualified as its Trustee in bankruptcy; it has accepted this suit as an asset of the bankrupt estate and has continued to prosecute it.

The question presented is whether the cancellation of an indebtedness of $11,098.10 admitted to have been due to Sears, Roebuck &. Co. from Stor-Aid which was accomplished by a written agreement dated November 23, 1942 (executed and effective as of November 1, 1942) resulted in taxable income to Stor-Aid or was properly treated upon its books of accounts and in its income tax returns as a non-taxable, voluntary, gratuitous forgiveness and discharge of a debt.

I have concluded that it produced taxable income for Stor-Aid, Inc. and was properly included in such income for the fiscal year involved. This conclusion I predicate upon the following findings of fact which I have set forth at length pursuant to Rule 52(a), Fed.Rules Civ.Proc. 28 U.S.C.A., and which I make upon the evidence presented on the trial had before me.

Stor-Aid was a New York corporation with its principal office at No. 347-5th Avenue, New York City, within the Third Internal Revenue District, N. Y. It was a manufacturer of collapsible wooden and cardboard wardrobes and chests. It kept its books and reported its income on an accrual basis for the fiscal year ending August 31. Stor-Aid of New Jersey, Inc. and Stor-Aid of Illinois, Inc. were wholly-owned subsidiaries of Stor-Aid, Inc.

A written agreement was made on October 27, 1941, as of September 1, 1941, between the three Stor-Aid corporations, which were designated in it as "Sellers", and Sears, Roebuck & Co., nationally known mail-order and retail store merchants. This agreement was received in evidence as plaintiff's exhibit 1. In substance as I construe this agreement its essential and relevant provisions provided that the term of the agreement was five years with a right to Sears to cancel at the end of the first year, upon giving at least ninety days' written notice prior thereto. (Paragraph Second). The "Sellers" agreed to manufacture and sell to Sears and it agreed to purchase, seventy-five percent of Sears' annual requirements of storage wardrobes and chests "as presently purchased by Sears" for its Department 625, with an option to Sears to increase the quantities "up to the Sellers' manufacturing capacity." (Paragraph First). The price to be paid for the merchandise was provided in detail in the agreement; in

1. 1948 Revised Judicial Code, 28 U.S.C.A. § 1346.

substance it was to be "equal to said Sellers' manufacturing cost," "plus 10% of such manufacturing cost." (Paragraph Third). These costs were called by the parties "contract prices", and they were to be arrived at quarterly during the first year and annually thereafter by the requirement that Sellers should furnish to Sears a written statement showing "the manufacturing cost and a determination of the contract prices of product sold and delivered to Sears" during the preceding period. Sears was given the right "to inspect and audit the books and records of Sellers for the purpose of ascertaining said manufacturing cost and contract prices." (Paragraph Eighth). During these quarterly periods it was further provided that the "billing prices" of the products so sold by "Sellers" to Sears were to be agreed upon by the parties and that "said billing prices shall (should) not exceed the competitive prices defined by the agreement, nor those prices given by "Sellers" to their most favored customer for the same or similar products. (Paragraph Fifth). It was further provided in "Eighth" that,

"In the event the aggregate of the billing prices of product sold and delivered to Sears hereunder during any quarterly period of the first year, or during any annual period of any succeeding year thereafter, exceeds the aggregate of the contract prices therefor determined as aforesaid, then Sellers will promptly credit, or at Sears' option pay, to Sears one-half of the difference."

After the end of the first year of operations under this agreement—August 31, 1942, which was coincident with the end of its fiscal year, Stor-Aid for its part determined that the aggregate of the "billing prices" for the period exceeded the "contract prices" by $22,196.20. It then credited upon its books of account to Sears one-half of this amount or $11,098.-10, as a debt due and owing from Stor-Aid to Sears. The item was also reflected, since it was not then paid, in the statement of liabilities of Stor-Aid as an account payable. It is conceded by paragraph 3-c of the pre-trial order entered herein that "the said liability and debt had accrued on August 31, 1942; and was then due and owing by Stor-Aid, Inc. to Sears, Roebuck & Co."

For its fiscal year ending August 31, 1942 Stor-Aid filed an original income tax (Form 1120) and excess profits tax (Form 1121) return dated January 14, 1943. (Exhibit 2). In these original returns Stor-Aid failed to include the $11,098.10 in its report under Gross Income—Item #1 on Form 1120 of Allowances made against Gross Sales; and this omission was reflected in Item 30 on Form 1120 and in turn in Item 1 on Form 1121 by increasing the net income subject to normal tax from $13,308.66 to $24,406.76. On these original returns for the fiscal year ending August 31, 1942, Stor-Aid reported itself subject to and paid a normal tax of $4,074.44 and an excess profits tax of $6,315.37. Later and on July 22, 1943 it filed amended returns on Forms 1120 and 1121 and in these credit was taken for the $11,098.10 which it had determined was due Sears as a refund or allowance under paragraph Eighth of the agreement of October 27, 1941. (Exhibit 3). With these amended returns, Stor-Aid filed a claim for refund of $6,298.56 made up of the over-payment of normal tax under Form 1120 of $1,377.34 and of excess profits tax under Form 1121 of $4,921.22. Upon audit of these amended returns, the Commissioner of Internal Revenue accepted the deduction of the credit given by Stor-Aid to Sears and upon that basis refunded the over-payment of tax made by Stor-Aid for its fiscal year ending August 31, 1942.

A second agreement was made on November 23, 1942, as of November 1, 1942 (Plaintiff's Exhibit 6). The parties were the same as in the agreement of 1941 save that Irving Blechman, the president and principal stockholder and executive of Stor-Aid, Inc. was added to those designated as "Sellers". It is this agreement which is the measure of plaintiff's claim and it reveals this claim to be without substance or merit.

The evidence shows that at the time it was made Stor-Aid was a prosperous and thriving enterprise and in no financial

difficulty. The income tax return (Form 1120) filed by Stor-Aid, Inc. for its fiscal year ending August 31, 1943 (Plaintiff's Exhibit 5) shows that for the year its gross sales had more than doubled over the prior year with a greater than sixfold increase in operating profits. Its business provided neither a necessity nor an appropriate occasion for any one with whom it had been dealing to make it a gift in the form of a remission of an acknowledged indebtedness or otherwise.

When this agreement of November 1, 1942 is examined it is found that the preamble refers not only to the making of the prior agreement of September 1, 1941, which I have already considered, but also to a "stock purchase" agreement of the same date (1941). This stock purchase agreement was not introduced in evidence by either plaintiff or defendant. Uninformed therefore as to its provisions or the operations under it, I have perforce entirely disregarded it except insofar as its cancellation which is provided for in paragraphs "1" and "2" supplies in law consideration for not only the accord to cancel it but for all of the other provisions of the 1942 agreement. The preamble also recites that

"* * * there are disputes between the parties as to the interpretation of said agreements and the obligations of the parties thereunder, as well as divers claims to moneys due thereunder;" and

that

"* * * the parties desire now to make final adjustment of all matters between them."

It is then provided that,

"1. The said two agreements dated October 27, 1941, as of September 1, 1941, referred to hereinabove, be and the same are hereby cancelled and terminated, except as hereinafter mentioned."

A reading of the remainder of this three-page document contains no further mention of "a stock purchase agreement"; it was simply cancelled and terminated in toto.

Following this it is further provided:

"2. Any and all obligations of all of the parties, as contained in said two mentioned agreements of October 27, 1941, as of September 1, 1941, are hereby specifically released and discharged (including, without being limited to, any claim of the Sellers for any additional moneys due for sales heretofore made to Sears, because of an order dated November 4, 1942, made by the Office of Price Administration) except for any unpaid invoices now due or to become due to the Sellers for shipments heretofore made to Sears, and except for a certain obligation by promissory note in the sum of $25,000.00 due to Sears from the Sellers, or some of them, and except for any liability of Sellers to Sears under Clause Eleventh of said cost plus sales agreement as to products sold by Sellers to Sears under said agreement to the date hereof."

It is also provided in paragraph "3" that from November 1, 1942 to August 31, 1943 the Sellers agree to sell to Sears at Sear's option such of their products as would not exceed $400,000 gross purchase price, at prices set forth in a schedule annexed to the agreement; that such prices shall in no event exceed the Sellers' prices to any other mail order house; that the Sellers agree to maintain warehousing arrangements to service Sears under the agreement and Sears agrees to add to each invoice $1\frac{1}{2}\%$ thereof until $9,000 has been paid to the Sellers for the warehousing expenses, which sum shall be credited to invoices for merchandise purchased by Sears after September 1, 1942. There is then contained in paragraph "4" a proviso that should "Sellers" default in their performance of the undertakings of paragraph "3" above set forth,

"* * * Sears shall, notwithstanding any other provisions or representations herein contained, have the right to assert any claims against Sellers, or any of them, under Clauses Fifth and Eighth of said cost plus sales agreement dated October 27, 1941, as of September 1, 1941, it being further

expressly understood that Sellers deny any liability to Sears under said clauses of said agreement."

The agreement ends with provisions for indemnity by "Sellers" of Sears against claims for patent infringement; and release of "Sellers" from claims of damage for failure to perform due to fire, war, labor difficulties, etc.

Following this agreement and on December 15, 1943, Stor-Aid filed its corporate tax returns Forms 1120 and 1121 for its fiscal year ending August 31, 1943 (Plaintiff's Exhibit 5). In these returns, Stor-Aid did not treat the cancellation of the account payable to Sears of $11,098.10, which it had in the prior year deducted as an allowance against Gross Sales, as income, but it did disclose this transaction in Schedule L of Form 1120 under Item 15 as Capital Surplus, thus increasing its net worth by way of capital to the extent of $11,098.10. This was accompanied by an explanatory note of Stor-Aid which it annexed to Form 1120, reading in part, "on November 23, 1942 the debt of $11,-098.10 was forgiven by Sears, Roebuck and Company and taxpayer has credited this amount to Paid-in-Surplus * * *." The transaction was further reflected in Form 1121 filed by Stor-Aid in Schedule C—showing Excess Profit Credit based on invested capital. In item 15 of this Schedule —C— the amount $11,098.10 was pro-rated on the calendar period for which it was claimed to have been employed and credit for 281 days' use of these "capital" funds in the amount of $8,544.02 was taken as an average addition to Equity Invested Capital during the taxable year. This addition to the capital account increased its credit allowable against Excess Profits Tax and effected a reduction in the amount of that tax.

When these returns were audited and examined the $11,098.10 was included as taxable income and disallowed as an addition to Paid-in-Surplus; Stor-Aid, Inc. was, for reasons with which we are not here concerned, allowed other deductions from income, not claimed by it in its returns, amounting to $1,587.53; as a result of this audit, the Income and Excess Profits

Taxes due from Stor-Aid for its fiscal year ending August 31, 1943 was increased in the amount of $7,087.37 above the sum previously reported. Demand was duly made by usual deficiency letter and notice on November 6, 1946, and on February 3, 1947 Stor-Aid paid under protest the amount of this assessment and interest thereon totaling $7,990.63. This suit was brought to recover this payment.

It is upon this showing and on these facts that the plaintiff contends that "there was no legal consideration for the cancellation of Stor-Aid's indebtedness by Sears, Roebuck and Co.", and that the cancellation of this indebtedness by the agreement of November 1, 1942 did not create taxable income to Stor-Aid, within the meaning of Section 22(a), Title 26 U.S. C.A. and was properly treated by it for tax purposes as a gift under Section 22(b)(3).

In Commissioner v. Jacobson, 1949, 336 U.S. 28, 48, 69 S.Ct. 358, 368, 93 L.Ed. 477, the Supreme Court wrote of these provisions:

"Both the general provision for taxation of income and this provision for the exclusion of gifts from gross income, for income tax purposes, have been in the Federal Income Tax Acts in substantially their present form since the Revenue Act of 1916. The contrast between the provisions is striking. The income taxed is described in sweeping terms and should be broadly construed in accordance with an obvious purpose to tax income comprehensively. The exemptions, on the other hand, are specifically stated and should be construed with restraint in the light of the same policy."

An essential element of a gift is the total absence of a material consideration. Pacific Magnesium v. Westover, D.C., 1949, 86 F.Supp. 644, 648. To hold the cancellation of the indebtedness of Stor-Aid a gift one would have to entirely disregard the provisions of paragraphs "1" and "2", releasing all parties of their obligations under the "stock purchase agreement", which agreement, all implicitly recognized contained binding

obligations of sufficient import to make necessary specific provision for their cancellation and discharge. But, quite aside from this provision, consideration of the entire transaction gives ample evidence that the agreement of November 1, 1942 was not without consideration.

■ The issue here turns upon whether "The forgiveness was gratuitous, a release of something to the debtor for nothing". Helvering v. American Dental Co., 1943, 318 U.S. 322, 331, 63 S.Ct. 577, 582, 87 L.Ed. 785. That it was the intent of the creditor to cancel the indebtedness is made manifest by the terms of the agreement; the motive prompting the surrender of this obligation of Stor-Aid is immaterial. The forgiveness or cancellation of the indebtedness is a fact; whether there was consideration for it passing to the creditor from the debtor must be determined by the agreement itself. The query then is: did it impose upon the debtor obligations or burdens not existing before the agreement? If it did the forgiveness resulted in taxable income; if it did not, it was a gift. As Mr. Justice Burton observed in Commissioner v. Jacobson, supra, 336 U.S. at page 51, 69 S.Ct. at page 370,

> "The situation in each transaction is a factual one. It turns upon whether the transaction is in fact a transfer of something for the best price available or is a transfer or release of only a part of a claim for cash and of the balance 'for nothing.'"

We inquire, then, as to what the creditor gained or acquired by the new agreement.

■ The agreement of November 1, 1942 is disclosed by the very wording of the preamble and by its contents as the product of negotiations which considered, adjusted and settled disputes and claims between Stor-Aid, Inc. and Sears, Roebuck & Co. The careful wording of the agreement, the preservation of the right of the "Sellers" to collect for unpaid invoices and to "Sears" of the liability of the "Sellers" on an unpaid promissory note for $25,000, the patent infringement indemnity provision and the exoneration from liability for excusable delays in performance,—all these, make it clear that it was but part of a cold business deal with neither party making or disposed to make any gift to the other, or in fact to grant to the other any concession other than the usual "give and take" of a purely commercial barter. It reflects just plain and simple business; it is devoid of all sentiment and reveals no motive save that of profit and gain. While I recognize that the fact that "the motives leading to the cancellations were those of business" is not significant, Helvering v. American Dental Co., supra, 318 U.S. at page 331, 63 S.Ct. at page 582, the entire transaction gives no evidence of "the receipt of financial advantages gratuitously", Helvering, etc., given by Sears to Stor-Aid. The factual situation here presented is in no manner analogous to that in Helvering.

New terms and conditions set the obligations of the parties. Thus, Sears was no longer bound to purchase of Stor-Aid 75% of its departmental requirements, but Stor-Aid was bound to sell at Sears' option merchandise up to the amount of $400,000; Stor-Aid undertook to maintain warehousing facilities in New York City and Chicago "solely for the purpose of servicing Sears"; and the cancellation of the indebtedness to Sears was made contingent upon faithful performance by Stor-Aid. Sufficient consideration has already been pointed out; it would be idle to detail all the consideration which study of the agreements discloses, in addition to the mutual promises of the parties which in themselves supply valid consideration. Schwartzreich v. Bauman-Basch, Inc., 1921, 231 N.Y. 196, 131 N.E. 887.

And, if the intention of the parties is to be given any weight, it is undisputed that there was no intention whatsoever on the part of Sears to make a gift to Stor-Aid. The uncontradicted testimony of Gudeman, an executive of Sears familiar with the transactions, given by his deposition makes it quite clear that no benefaction was intended by Sears and none expected by Stor-Aid. Viewed realistically, one cannot conclude that in the circumstances here pre-

220

sented a gift was ever intended or in fact made.

The complaint is dismissed and the Clerk is directed to enter judgment for the defendant with costs.