Madden, Judge,
delivered the opinion of the court:
The plaintiff Pennsylvania Electric Company, hereinafter called Penelec, was an operating electric utility company in Pennsylvania. It was a member of a highly complex hierarchy of which the Associated Gas and Electric Company, Ageco, was the top holding company, and there were a number of intermediate holding companies between Ageco at the top, and Penelec and the numerous other operating companies.
About July 1931, Penelec issued and sold to the public through bankers some $9,000,000 principal amount of its 31^% Gold Notes due August 1, 1932. As the due date of these Gold Notes approached, Penelec did not have the money, nor the capacity to borrow at banks, to pay them. Other operating companies in the Ageco system also had large debts falling due in 1932.
The parent, grandparent, and great grandparent of Penelec, in the holding company system, had their bonds outstanding in the hands of some 190,000 investors. The parent companies solicited these holders of their securities to buy additional bonds, but were able to sell only $7,600,000 worth of bonds to them out of an offer of $40,000,000.
*316 The parent companies held large quantities of bonds of their operating companies, which they had taken for the purpose of marketing if a situation arose in which it was necessary to raise cash and the holding companies’ own. bonds would not sell to advantage. Among bonds so held by parent companies were $13,551,000 principal amount of Penelec’s Series E and G bonds. But these bonds were not as readily saleable as was necessary, and it was decided that Penelec should exchange to its parent companies for these bonds, bonds more attractive to investors because they had a shorter maturity and a higher interest rate. For this exchange Penelec issued its Series H bonds. But it issued only $12,000,000 of Series H bonds in exchange for the $13,551,000 of Series E and G bonds which were surrendered. This made Penelec’s balance sheet look $1,551,000 better, and made its Series H bonds look still more attractive to potential purchasers of the H bonds from the parent companies.
Penelec’s parent companies then offered the Series H bonds to the holders of the $9,000,000 of Gold Notes, whose maturity was impending, at bargain prices. They offered $6,000 of Series H bonds, plus $200 in cash, for each $5,000 of Gold Notes. Only $852,000 face value of the Series H bonds were disposed of on this basis. They next offered new Penelec One, Two, and Three Year Gold notes, which contained the privilege of conversion of each $1,000 of such notes into $1,200 of Series H bonds. This offer did not bring in all of the 1932 Gold Notes, and the rest of them were bought in for cash which was raised by selling the new convertible Gold Notes to bankers.
As we have said, only $12,000,000 of Penelec Series H bonds were given by it to its parent companies in exchange for $13,551,000 face value of its Series E and G bonds. The Commissioner of Internal Revenue held that Penelec had made a profit out of this transaction. The profit was not the entire $1,551,000 difference between the two figures, because Penelec, when it had originally issued the E and G bonds, had not received their face value, but only 95% of their face value. After allowing for this discount, the profit which the Commissioner of Internal Revenue attributed to the exchange of H bonds for E and G bonds was $873,450. This alleged *317 profit was called a “premium” and, for income tax purposes was to be “amortized” or distributed in equal parts over tbe 30-year life of tbe bonds. Thus Penelec was held to have a profit of $29,115 for each year of the life of the bonds.
For the years 1932 and 1933 consolidated federal income tax returns were filed by Ageco, the top holding company of the affiliated group, for all the members of the group including Penelec and the parent companies involved in the exchange of the bonds. In such a consolidated return no gain or loss on inter-group transactions was permitted to be taken into account. Therefore, for the years 1932 and 1933 the alleged profit of $29,115 was not taxed. But the law permitting consolidated returns for such groups was changed, and for the years 1934 to 1938 inclusive and for the years 1940 and 1941, Penelec filed its separate return and was required to pay the tax on the $29,115 of profit for each of those years. For the year 1942, the top holding company of the system filed a consolidated return for the whole group. The H bonds then held by persons other than the group covered by the consolidated return were retired in that year, and the unamortized “premium” was taxed.
The Commissioner of Internal Bevenue, in concluding that Penelec had made a profit on the exchange of the bonds, merely subtracted the face value figure of the II bonds put out from the face value figures of the E and G bonds taken in, with an appropriate adjustment for the fact that the latter bonds had originally been issued at a 5% discount. The plaintiff Penelec says that the difference between the figures was not profit, but was a capital contribution to Penelec by its parent companies for the purpose of improving its financial situation and making its newly issued securities more marketable. Our findings show that, in our view, it was such a capital contribution and not a taxable profit.
Penelec’s parent companies, which owned its stock, could, of course, have dictated any terms which they chose for the exchange of the bonds. They chose to make the capital contribution because Penelec was their property, and its financial integrity and credit were valuable to that proprietary interest. The situation was unlike that in Commissioner v. Jacobson, 336 U. S. 28, and Marshall Drug Co. v. United *318 States, 118 C. Cls. 532, where creditors having no proprietary-interest in the debtor made the best settlement they could get of insecure debts. In those cases the debtor, as taxpayer, was claiming that the reduction was a non-taxable gift. It was not, because there was no donative intent. But a contribution to capital does not require a donative intent, in the sense that there should be no business motive in making it. There is always the proprietor’s business motive of making his property more valuable.
In Penelec’s accounting, it treated the difference in the face value of the bonds involved in the exchange as a capital contribution. Then the Pennsylvania Public Utility Commission required it to change its accounting so as to amortize the amount, as a premium, over the life of the bonds. The system of accounting imposed upon a public utility by a regulatory commission is “not binding upon the Commissioner (of Internal Revenue), nor may he resort to the rules of that body, made for other purposes, for the determination of tax liability under the revenue acts”. Old Colony Railroad Company v. Commissioner, 284 U. S. 552, 562.
If the difference in the face value of the bonds which the Commissioner of Internal Revenue designated as a premium was not, as we have found, a capital contribution, it would seem to us to have been a situation for the application of the doctrine of United States v. Kirby Lumber Co., 284 U. S. 1, and Commissioner v. Jacobson, 336 U. S. 28. In those cases the taxpayer purchased some of its bonds at less than the issuing price, and the Court held that the difference was taxable income in the year in which the bonds were purchased. Treasury Regulations 77 (1932 ed.) Art. 68 Sec. 3 (c) says:
If, however, the corporation purchases and retires any of such bonds at a price less than the issuing price plus any amount of discount already deducted, the excess * * * over the purchase price is gain or income for the taxable year.
From the foregoing it would seem that, if the excess in question here was taxable at all, it was taxable in 1932 and was not a proper subject for amortization.
The plaintiffs make an argument concerning the year 1942 which they are foreclosed from making for the other years in *319 question because they did not, in their claims for refund for the other years, assert that basis for their claims. They say that, far from their having exchanged their H bonds at a premium, as the Government says they did, they exchanged them at a discount, and were entitled to the deduction provided for in Sec. 3 (a) of the Treasury Eegulation referred to above, which says:
If bonds are issued by a corporation at a discount, the net amount of such discount is deductible and should be prorated or amortized over the life of the bonds.
The plaintiffs’ argument on this point is not easy to follow. The usual case of the issuance of bonds at a discount is the sale of the bonds by the issuer at less than par. Here $12,-000,000 of H bonds were exchanged for $13,551,000 of E and G bonds. But the plaintiffs say, and we have found, that if the H bonds had been offered to the public in arms-length sales they would not have brought more than $18 per $100 of face value. Therefore, say the plaintiffs, the sale by Penelec to its parent companies should be treated as if it had been made at $78, the market value. They say that the Commissioner of Internal Eevenue could, if the tables had been turned, have disregarded the figures used by the affiliates and put true values upon the objects of the exchange. For a simple illustration, if Penelec’s H bonds had been worth $100 in the market, but it had issued them to its parent company, which owned all of its stock, for $90, the Commissioner could have concluded that that was a way of giving the parent a dividend, on which, when it resold the bonds in the market, it would be taxed only at the capital gains rate, and giving Penelec a deduction for the discount at which it issued the bonds. The plaintiffs are right, of course, in their view of what the Commissioner of Internal Eevenue could, and probably would, do in that situation. But we think that the maxim, “What’s sauce for the goose, etc.” is not of such universal validity as to compel the conclusion that the affiliated group can also disregard the figures which it has used in its intra-family transactions.
Omitting the $1,551,000 of E and G bonds which we have found to have been a capital contribution to Penelec by its parents, the exchange was $12,000,000 of H bonds for $12,- *320 000,000 of E and G bonds. The plaintiff asserts and we have found that the H bonds were worth only $78 in the open market. We have found that the market for the E and G bonds was similarly depressed. But Penelec owed the face value of the E and G bonds, before the exchange, and owed the face value of the H bonds, after the exchange. Unless it could find the cash to buy them up in open market while that market was still depressed, the face value was the amount which it would have to pay when the bonds came due. We think the H bonds were not issued at a discount.
The plaintiffs’ argument is original and there are no decisions in point. A somewhat similar claim was made in Spear Box Company, Inc. v. Commissioner, 182 F. 2d 844, (2d Circ.). There the taxpayer had bought up some of its debentures at less than par, and the Commissioner proposed to tax it on the difference. The taxpayer claimed that the debentures were not worth par and that only the excess of their actual value over the redemption cost should be taxed. The court said that the regulations provided that the issuing price was determinative and further said :
This is as it should be, for the debtor owes the face amount of his debt.
The plaintiffs are entitled to recover, with interest according to law. Entry of judgment is suspended to await the filing of a stipulation by the parties showing the amount due in accordance with our opinion and findings of fact.
LaeamoRE, Judge; Whitaker, Judge; Littleton, Judge; and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner George H. Foster, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff Pennsylvania Electric Company (hereinafter referred to as “Penelec”) is, and at all times hereinafter mentioned was, a corporation duly organized and existing under the laws of the State of Pennsylvania. It is, and at all times hereinafter mentioned was, engaged in business as *321 ■a public utility operating company, with its principal office and place of. business at Johnstown, Pennsylvania.
2. Plaintiff General Public Utilities Corporation is, and at all times hereinafter mentioned was, a corporation duly organized and existing under the laws of the State of New York. It is, and at all times hereinafter mentioned was, engaged in business as a public utility holding company with its principal office and place of business in New York, New York. General Public Utilities Corporation was known as Associated Gas and Electric Company prior to January 12, 1946, when its name was changed to its present name, and is hereafter referred to-as “Ageco” or “GPU”. All the plaintiffs named in case No. 50201 are domestic corporations, and the address of General Public Utilities Corporation is 67 Broad Street, New York, New York.
3. At all .times during the calendar year 1942, GPU was the common parent corporation of an affiliated group of corporations, the other members of which were the other plaintiffs in No. 50201.
4. For the calendar year 1934, Penelec, within the limitation period as extended, filed its. Federal corporation income and excess profits tax return with the collector of internal revenue for the 23rd District of Pennsylvania on June 10, 1935, and paid the sum of. $147,483.78, the amount shown to be due thereon, in quarterly installments starting on or about March 15,1935.
5. For the calendar year 1935, Penelec, within the limitation period as extended, filed its Federal corporation income and excess profits tax return with the collector of internal revenue for the 23rd District of Pennsylvania on May 26, 1936, and paid the sum of $91,351.55, the amount shown to be due thereon, in quarterly installments starting on or about March 14,1936.
6. After investigation and report by a revenue agent, the Commissioner of Internal Revenue (hereinafter referred to as “the Commissioner”) determined a taxable net income of $1,232,017.82 for the calendar year 1934, which resulted in the. determination of a deficiency in Federal income taxes against Penelec for such year 1934 in the amount of $21,-918.67, which sum, together with $6,250.42 interest thereon, *322 was timely assessed and was thereafter paid by said plaintiff to the collector of internal revenue for the 23rd District of Pennsylvania on January 8,1940. ■
7. After investigation and report by a revenue agent, the Commissioner determined a taxable net income of $1,097,-724.86 for the calendar year 1935, which resulted in the determination of a deficiency in Federal income taxes against Penelec for such year in the amount of $59,585.62, which sum, together with $14,906.19 interest thereon, was timely assessed and was thereafter paid by said plaintiff to the collector of internal revenue for the 23rd District of Pennsylvania on May 27,1940.
8. On October 31, 1941, Penelec filed claims for refund for the calendar years 1934 and 1935, claiming refunds in the amounts of $11,222.75 and $11,568.53, respectively, for the calendar years 1934 and 1935, together with interest as provided by law.
In the claims for refund filed by Penelec for the years 1934 and 1935, a deduction of $29,115 was claimed as additional amortization of bond discount and expense. ' This is the sum determined by the Commissioner of the Internal Revenue Service as taxable premium on the issuance of the H-bonds on May 7, 1932.
9. On or about May 6,1942, the internal revenue agent in charge at Baltimore, Maryland, mailed to Penelec a copy of a revenue agent’s report dated April 20, 1942, relating to said claims for refund, which recommended the allowance of Peiielec’s claim for refund for the calendar year 1934 in the amount of $11,346.84 and for the calendar year 1935 in the amount of $10,614.82.
10. On or about May 20, 1943, the internal revenue agent in charge at Baltimore, Maryland, mailed to Penelec a copy of a revenue agent’s supplemental report dated May 8,1943, which recommended the allowance of the company’s claim for refund for 1934 to the extent of $7,239.87 and for 1935 to the extent of $7,106.40, and the rejection of the balance of such refunds claimed. '
11. On or about May 25, 1944, the Commissioner issued to Penelec certificates of overassessment, together with Treasury checks transmitted therewith, refunding Federal income *323 tax and interest paid for the years 1934 and 1935, in the respective amounts of $9,304.43 and $8,884.17, with interest thereon of $2,339.87 and $2,026.68, respectively. On May 25, 1944, the Commissioner mailed to Penelec, by registered mail, notices of disallowance of the aforesaid claims for refund.
12. For the calendar year 1936, Penelec, within the limitation period as extended, filed its Federal corporation income and excess profits tax return with the collector of internal revenue for the 23rd District of Pennsylvania on May 14, 1937, and paid the sum of $122,585.87, the amount shown to be due thereon, in quarterly installments starting on or about March 15,1937.
13. For the calendar year 1937, Penelec, within the limitation period as extended, filed its Federal corporation income and excess profits tax return with the collector of internal revenue for the First District of Pennsylvania on May 14, 1938, and paid the sum of $207,550.75, the amount shown to be due thereon, in quarterly installments starting on or about March 15,1938.
14. For the calendar year 1938, Penelec, within the limitation period as extended, filed its Federal corporation income and excess profits tax return with the collector of internal revenue for the First District of Pennsylvania on June 15, 1939, and paid the sum of $282,160.11, the amount shown to be due thereon, in quarterly installments starting on or about March 15,1939.
15. For the calendar year 1940, Penelec, within the limitation period as extended, filed its Federal corporation income, declared value excess profits, and defense tax returns, with the collector of internal revenue for the 23rd District of Pennsylvania on May 5, 1941, and paid the sum of $550,-696.70, the amount shown to be due thereon, in quarterly installments starting on or about March 19,1941.
16. After investigation, the revenue agent, in report dated June 28,1940, proposed a taxable net income of $1,357,501.96 for the year 1936 and a deficiency in Federal income tax of $63,454.50 against Penelec. After a conference on Penelec’s. protest of the revenue agent’s computations, a taxable net income of $1,221,694.10 and a resulting deficiency in Federal income tax of $34,083.53 were determined for the year 1936,. *324 as shown by a statement of revised income and computation of deficiency in income tax attached to a letter dated July 28,1941, from the internal revenue agent in charge at Baltimore, Maryland. The deficiency in tax of $34,083.53, together with interest thereon of $9,121.78, was timely assessed against Penelec. Penelec paid this deficiency and interest to the collector of internal revenue for the 23rd District of Pennsylvania on September 24,1941.
. 17. After further investigation and report by a revenue agent dated May 8, 1943, the Commissioner determined a taxable net income of $1,248,695.19 for the calendar year 1936,- which resulted in the determination, as set forth in a 90-day letter issued to Penelec by the Commissioner on July 7, 1943, of a further deficiency of Federal income taxes against Penelec for such year in the amount of $5,656.72, which sum, together with $2,279.42 interest thereon, was timely assessed against said plaintiff. On December 15, 1943, said plaintiff paid to the collector of internal revenue for the 23rd District of Pennsylvania the aforesaid deficiency and interest.
18. After investigation, the revenue agent, in report dated June 27,1940, proposed a taxable net income of $1,810,945.31 for the year 1937 and a deficiency in Federal income tax of $34,509.56 against Penelec. After a conference on said plaintiff’s protest of the revenue agent’s computations, a taxable net income of $1,702,565.56 and a resulting deficiency in Federal income tax of $18,252.59 were determined for the year 1937, as shown by a statement of revised income and computation of deficiency attached to a letter dated July 28, 1941, from the internal revenue agent in charge, Baltimore, Maryland. This deficiency of $18,252.59 and the interest thereon of $3,792.71 were timely assessed against said plaintiff. This deficiency and interest were paid by said plaintiff to the collector of internal revenue for the First District of Pennsylvania on September 27,1941.
19; After further investigation and report by a revenue agent dated May 8, 1943, the Commissioner determined a taxable net income of $1,730,045.22 for the calendar year 1937, which resulted in the determination, as set forth in the 90-day letter issued to Penelec by the Commissioner on *325 July 7,1943, of a further deficiency in Federal income taxes against Penelec for such year in the amount of $4,121.95, which sum, together with $1,418.66 interest thereon, was timely assessed against said plaintiff. On December 15, 1943, said plaintiff paid to the collector of internal revenue for the 23rd District of Pennsylvania this aforesaid deficiency and interest.
20. After investigation the revenue agent, in report dated June 27,1940, proposed a taxable net income of $2,046,002.95 for the calendar year 1938 and a deficiency in'Federal income tax of $49,244.55 against Penelec. After a conference on said plaintiff’s protest of the revenue agent’s computations, a taxable net income of $1,970,224.22 and a resulting deficiency in Federal income tax of $32,543.53 were determined for the year 1938, as shown by the statement of revised income and computation of deficiency attached to the letter of July 28, 1941, from the internal revenue agent in charge at Baltimore, Maryland. This deficiency of $32,543.53, together with interest thereon of $4,809.61, was timely assessed against said plaintiff. This deficiency and interest was paid by said plaintiff to the collector of internal revenue for the First District of Pennsylvania on September 27, 1941.
21. After further investigation and report by a revenue agent dated May 8, 1943, the Commissioner determined a taxable net income of $1,997,821.14 for the calendar year 1938, which resulted in the determination, as set forth in the 90-day letter issued to Penelec by the Commissioner on July 7,1943, of further deficiency in Federal income taxes against Penelec for such year in the amount of $5,827.35, which sum, together with $1,648.90 interest thereon, was timely assessed against said plaintiff. On December 15, 1943, said plaintiff paid to the collector of internal revenue for the 23rd District of Pennsylvania this aforesaid deficiency and interest.
22. After investigation and report by a revenue agent dated April 20, 1942, the Commissioner determined a taxable net income of $2,362,704.89 for the calendar year 1940, which resulted in the determination of a deficiency in Federal income taxes against Penelec for such year in the amount of $11,030.32, which sum, together with $784.41 interest thereon, was timely assessed by the Commissioner and was paid by *326 said plaintiff to tbe collector of internal revenue for the 23rd District of Pennsylvania on June 4,1942.
23. After further investigation and report by a revenue agent dated May 8, 1943, the Commissioner determined a taxable net income of $2,391,064.89 for the calendar year 1940, which resulted in the determination, as set forth in the 90-day letter issued to Penelec by the Commissioner on July 7, 1943, of a further deficiency in Federal income taxes against Penelec for such year in the amount of $6,806.40, which sumí, together with $973.03 interest thereon, was timely assessed and was thereafter paid by said plaintiff to the collector of internal revenue for the 23rd District of Pennsylvania on December 15,1943.
24. On December 12,1945, Penelec filed claims for refund for the calendar years 1936, 1937, 1938, and 1940, claiming refunds in the amounts of $5,656.72, $4,121.95, $5,827.35, and $6,806.40, respectively, for the said respective calendar years, together with interest as provided by law.
The claims for refund filed by Penelec for the years 1936 through 1938 and for 1940 are grounded, among other questions not at issue here, upon the contention that the addition to the taxpayer’s income of the amount of $29,115 is in error by reason of the following:
1. Premium on issuance of bonds is gain realized in the year of the issuance of the bonds which is not recognized when the transaction is between members of an affiliated group in a consolidated return period because of provisions of applicable regulations.
2. No premium or discount is realized by reason of issuance of bonds by a corporation for property.
3. Gratuitous cancellation of indebtedness or contribution by controlling stockholder does not give rise to income because there is involved either a gift or a capital contribution.
25. On January 3, 1947, the Commissioner mailed to Penelec by registered mail, notices of disallowance of the claims for refund for the calendar years 1936,1937, and 1940.
26. On August 28, 1947, the Commissioner mailed to Penelec by registered mail a notice of disallowance of the claim for refund for the calendar year 1938.
*327 27. For the calendar year 1941, Penelec filed its Federal corporation income and declared value excess profits tax return with the collector of internal revenue for the 23rd District of Pennsylvania on or about March 16, 1942, and paid the sum of $665,157.41, the amount shown to be due thereon, in quarterly installments starting on or about March 16, 1942.
28. After investigation and report by a revenue agent dated August 6, 1943, the Commissioner determined a taxable net income of $2,211,767.51 for the calendar year 1941, which resulted in the determination of a deficiency in Federal income taxes against Penelec for such year in the amount of $19,351.85, which sum, together with $1,954.27 interest thereon, was timely assessed and was paid by said plaintiff to the collector of internal revenue for the 23rd District of Pennsylvania on December 30, 1943.
29. On December 18,1945, Penelec filed a claim for refund for the calendar year 1941, claiming a refund in the amount of $19,351.85 for the said calendar year, together with interest as provided by law. This claim was also grounded upon the issues set forth in finding 24.
30. For the calendar year 1942, Penelec filed its Federal corporation declared value excess profits tax return with the collector of internal revenue for the Second District of New York on March 15,1943. Said return disclosed a net income of $1,140,299.52 for declared value excess profits tax computation, but, by reason of allowable credits, there was no liability for declared value excess profits tax.-
31. After investigation and report by a revenue agent dated March 31, 1945, the Commissioner determined net income subject to declared value excess profits tax of $89,211.12 for the calendar year 1942, which resulted in the determination of a deficiency in declared value excess profits tax against Penelec for such year in the amount of $5,887.93, which sum, together with $747.60 interest thereon, was timely assessed and was paid by said plaintiff to the collector of internal revenue for the Second District of New York on May 11, 1945.
32. On April 25,1947, Penelec filed a claim for refund for the calendar year 1942, claiming a refund in the amount of *328 $5,887.93 for the said calendar year, together with interest as provided by law.
The claims for refund filed by Penelec and GPU for the year 1942 are grounded, among other questions not at issue here, upon the contention that the action of the Commissioner was erroneous for the following reasons:
(a) The Series H bonds were not issued at a premium but instead at a discount.
(b) No premium or discount is incurred by a corporation which issues its bonds' to an affiliated company during a period for which consolidated returns are filed until either one of the following events occurs:
(1) the bonds are transferred to a nonaffiliated holder; or
(2) there is a taxable year in which consolidated returns are no longer filed on behalf of the issuing company and said affiliate.
Upon the occurrence of either of said events, discount or premium may be incurred.
(c) The interrelations of Penelec and other members of the Associated Gas and Electric Company affiliated group were of such a character that Penelec incurred discount upon the transfer of the' Series H bonds by affiliates of Penelec to nonaffiliated holders.
(d) The gratuitous cancellation of indebtedness or contribution by a controlling stockholder does not give rise to income because there is involved either a gift or a capital contribution.
33. On June 30,1949, the Commissioner mailed to Penelec by registered mail notices of disallowance of the claims for refund for the calendar years 1941 and 1942.
34. For the calendar year 1942, GPU, as common parent corporation of its affiliated group of corporations, on or about March 16, 1943, filed with the collector of internal revenue for the Second District of New York a tentative consolidated Federal income tax return on its own behalf and on behalf of the other corporations of the affiliated group, reporting thereon an estimated tentative tax of $990,110.98. On or about March 16,1943, said plaintiff paid $296,149.57 of this estimated tentative tax. Thereafter, on September 7, 1943, GPU filed with the collector of internal *329 revenue for the Second District of New York a corporation income and declared value excess profits tax return for the calendar year 1942 on its own behalf and on behalf of the other corporations of the affiliated group reporting thereon a consolidated net loss and no tax liability.
35. On April 26, 1945, GPU, as common parent of the 1942 affiliated group made an additional payment of $561,-315.07 to the collector of internal revenue for the Second District of New York on account of the consolidated Federal income tax liability of the 1942 affiliated group for the calendar year 1942.
36. After investigation and report by the revenue agent dated October 4, 1945, the Commissioner determined a taxable net income for the 1942 affiliated group of $4,498,746.41 for the calendar year 1942 which resulted in the determination of a Federal income tax liability of the affiliated group for said year in the amount of $1,119,544.46, which sum, together with $117,727.54 interest thereon, was timely assessed against GPU as common parent corporation of the 1942 affiliated group. Thereafter, GPU paid $380,626.92 to the collector of internal revenue for the Second District of New York on March 4,1946.
37. On or prior to April 1, 1947, GPU filed a claim for refund of Federal income tax paid by it on behalf of the 1942 affiliated group for the calendar year 1942 claiming a refund in the amount of $823,394.89, or such larger amount as is legally refundable, together with interest as provided by law.
38. On June 30, 1949, the Commissioner mailed to GPU by registered mail a notice of disallowance of the claim for refund for the calendar year 1942 on behalf of the 1942 affiliated group.
39. Subsequently, there was refunded to GPU the sum of $3,719.38, representing interest paid on account of Federal income tax on behalf of the 1942 affiliated group for the calendar year 1942, together with interest thereon in the sum of $1,121.31.
40. At all times from January 1, 1930, to December 31, 1942, Penelec was a part of the Associated Gas and Electric System, which was a large group of utility operating com *330 panies and holding, investment, and miscellaneous companies connected by stock ownership. Ageco was the com-mpn parent company of most of such companies.
41. All the outstanding voting stock of Penelec was owned by Pennsylvania Electric Corporation (hereafter referred to as “Penelecorp”) during all periods from January 1930 to December 22, 1941, when Penelecorp (whose name had been changed in 1935 to Central U. S. Utilities Company) was merged into Associated Electric Company (hereinafter referred to as “Aelec”), and at all times thereafter the outstanding voting stock of Penelec was owned by Aelec. Aelec at all such times prior to said merger owned all the outstanding voting stock ot Penelecorp. At all times mentioned herein all the outstanding stock of Aelec was owned by Associated Gas and Electric Corporation (whose name was Associated Utilities Investing Corporation (Del.) prior to February 25, 1932, and which is hereinafter referred to as “Agecorp”), or predecessor companies which were merged into that company. At all times mentioned herein all the outstanding capital stock of Agecorp was owned by Ageco.
42. Penelec, Penelecorp, Aelec, and Agecorp were members of an affiliated group of corporations (hereinafter referred to as “the affiliated group”) throughout the calendar years 1929 to 1933, inclusive, of which Ageco was the common parent corporation. Consolidated Federal income tax returns were filed for the affiliated group for the calendar years from 1929 to 1933, inclusive, by Ageco as parent corporation. The Federal income tax liability for such years of the members of the affiliated group was determined on the basis of consolidated returns.
43. About July 1931, Penelec issued and sold to bankers approximately $9,000,000 principal amount of its Sy2 percent Gold notes, due August 1, 1932 (hereinafter referred to as “3y2 percent notes of 1932”). The notes were sold by the bankers to the public, and the majority of those notes were outstanding in the hands of the public on May 7,1932. The cash proceeds from the sale of those notes were not paid to Penelec, but instead were paid to the holding company parents of Penelec, which credited Penelec therefor on open account.
*331 44. In December 1930, Penelecorp cancelled $12,390,573.37 principal amount of Penelec’s debt which bore interest for the first six months of 1930 at 8 percent and 6 percent interest for the last six months of 1930. The month-end cash balances of Penelec from January to July 31, 1932, did not exceed $732,000. At no time during said period did Penelec have available more than $1,500,000 in cash and more than $1,500,000 of net current assets. In the spring of 1932 Penelec was very much disturbed about the necessity of meeting the maturity of its 3y2 percent notes due August 1,1932. Penelec’s cash position was such that it had to resort to small loans from country banks in the territory in order to meet its day-to-day cash requirements. In October 1931, its officers were authorized by the board of directors to borrow amounts ranging from $1,000 to $25,000 each, but totaling $80,500 from banks in the smaller localities of Pennsylvania; these loans were to be on a 60- to 90-day basis with interest at the best rates obtainable. Penelec was unable to meet the August 1, 1932, maturity of the 3y2 percent notes of 1932 from its earnings.
45. The established financing policy of the Associated System had long been to restrict to a minimum the issues of bonds and preferred stocks of operating subsidiaries; all new money needed was obtained, so far as practicable, through the issuance of securities of the parent company. At the beginning of 1932, the Associated System holding companies held nearly $60,000,000 principal amount of operating company mortgage bonds, including $13,551,000 principal amount of Penelec series E and G bonds, as described in findings 52 to 57, inclusive, available for sale. This was in line with the policy under which the operating companies issued their securities to the holding companies, which attempted to sell their own securities and when that failed, the holding companies would fall back upon the operating company securities held by them. The extremely unsatisfactory condition of the bond market at the time, however, made it difficult, if not impossible, to sell these bonds at anywhere near a fair price.
46. In 1931, with unsatisfactory market conditions, bank failures, declining business, and other conditions attendant *332 on the depression, it became increasingly difficult for the Associated System to market securities. In 1931, Associated Gas and Electric Company suspended the payment of cash dividends on its class A stock (4,681,857 shares of class A stock were outstanding with the public on December 31, 1931), which constituted its principal issue of publicly held stock.
47.During 1931 there were four issues of mortgage bonds and three issues of one-year notes of subsidiaries, for the purpose of retiring securities of greater yields and repayment of advances.
The mortgage bond issues were as follows:
New Jersey Power & Light Company, 4%%-$8,048,500
Pennsylvania Electric Company, 4%- 5,442,000
Metropolitan Edison Company, 4%_ 4, 770,000
New York State Electric & Gas Corp., 4%%- 6,985,100
The one-year notes of subsidiaries were as follows:
Staten Island Edison Corp., 3% due June 15-$7,500, 000
Rochester Gas and Electric Corp., 3% due July 15- 10, 000,000
Pennsylvania Electric Co., 3%% due August 1- 9,000,000
48. At the beginning of 1932, the Associated System was faced with the necessity of providing for obligations maturing during that year in the amount of $47,529,802.
49. In February 1932, Associated Gas and Electric Company sought to raise funds to meet maturities through an attempted marketing with that company’s security holders (there were 190,000 registered security holders of that company) of its Guaranteed 8 percent Eight Year Gold Bonds; the letter to security holders is set forth in plaintiffs’ exhibit 5 and is incorporated herein by reference. A similar offer was made and similar letters sent by Associated Gas and Electric Company to security holders of operating companies.
50. Subsequently, the offering to Associated System security holders was modified so that Eight Year 8 percent Gold Bonds of Associated Gas and Electric Corporation were issued instead of the Guaranteed 8 percent Eight Year Gold Bonds of Associated Gas and Electric Company. These bonds were offered in denominations of as low as $10 each and the employee and managerial personnel of the Asso *333 ciated System companies assisted in the effort to dispose of the bonds. Although $40,000,000 of the bonds were offered, the Associated System succeeded in disposing of $7,600,000 principal amount of the bonds which it characterized as a “most remarkable achievement.”
51. In July 1932 a letter was sent to the security holders of Associated Gas and Electric Company, contained in plaintiffs’ exhibit 6, which is incorporated herein by reference, in which it was set forth that within the next month $18,556,000 principal amount of short term notes of operating subsidiaries, principally held by banks and corporations, including $7,560,000 principal amount of Penelec 3y2 percent notes of 1932, must be met; that Associated Gas and Electric Company had no excess funds which could be applied to the reduction of these debts, and offering to sell to such security holders, in order to raise cash, mortgage issues of the following four operating subsidiary companies.-
New Jersey Power & Light Company
Metropolitan Edison Company
New York State Electric & Gas Corporation
Pennsylvania Electric Company
The security holders were urged in “this emergency” to “protect your present investments” in Associated System securities by subscribing for the operating company issues. The first issue offered, which were first mortgage 4y2. percent Gold Bonds, due 1960, of New Jersey Power & Light Company, were offered at $80 per $100 bond and on the installment basis with payments as low as $10 per month per $1,000 bond being accepted. The letter stated that the cooperation of .the security holder “should ward off the serious consequences apt to follow the failure to meet these maturing obligations which might eventually result in re-ceiverships.”
52. In October and December 1930 Penelec had issued $22,593,000 principal amount of its series E, First and Refunding Mortgage Gold Bonds, 4% percent due 1970, callable at 102y2 percent of face amount up to March 1,1940' (hereinafter referred to as “series E bonds”). Such series E bonds had been issued by Penelec to its parent company, Penelecorp, at a price of $95 for each $100 principal amount *334 thereof, Penelee charging its open account with Penelecorp for the issue price of such bonds, thus showing net receipts of $21,463,350 and aggregate discount of $1,129,650.
•53. During the year 1930, Penelecorp transferred said series E bonds to other member of the affiliated group, on open account, at $95 for each $100 principal amount, and in January 1931 Agecorp acquired $18,006,000 principal amount of said bonds from Ageco, on open account, at $95 for each $100 principal amount.
54. In September 1931, Penelee received and retired $5,000,000 principal amount of said series E bonds and in consideration therefor issued $5,000,000 principal amount of its series G, First and Refunding Mortgage Gold Bonds, 4 percent due 1961, callable at 105 percent of face amount on or before August 1, 1936 (hereinafter referred to as “series G bonds”), to Agecorp (then known as Associated Utilities Investing Corporation (Del.)).
55. Between October 1930 and May 7, 1932, there were various intercorporate transfers of said series E and G bonds between various members of the affiliated group. On May 7, 1932, Aelec and Agecorp, member companies of the affiliated group, held these series E and G bonds in the amounts as follows:
Aelec, series E_$10,945,000
Agecorp, series E___ 648, 000'
Agecorp, series G_ 1,958,000
$13, 551,000
56. The aforesaid $13,551,000 of Penelee series E and G bonds held by Aelec and Agecorp on May 7, 1932, had at all times since their issuance by Penelee been held by members of the affiliated group.
57. On or about May 7,1932, Penelee received and retired the aforesaid $13,551,000 principal amount of its series E and G bonds held by Aelec and Agecorp, and in consideration therefor issued $12,000,000 principal amount of its series H, First and Refunding Mortgage Gold Bonds, 5 percent dated April 15, 1932, due April 15, 1962, callable at 105 percent through April 15,1947 (hereinafter referred to as “series H bonds”). Aelec receiving $9,850,500 principal amount of the *335 series H bonds and Agecorp receiving $2,149,500 principal amount of said bonds. The aforesaid $12,000,000 was the entire issue of the series H bonds, none having been issued prior to the aforesaid transaction. At the time of said transaction, the remaining unamortized issuance discount of series E and G bonds, as determined by the Commissioner, was $677,550.
58. All of Penelec’s series C, D, E, F, G, and H First and Eefunding Gold bonds were equally secured by a first mortgage upon all property of the company then owned or thereafter acquired, subject as to property thereafter acquired to any mortgage or lien which might exist thereon at the time of such acquisition. All of these bonds were direct obligations of Penelec. The only differences between the series C, D, E, F, G, and II bonds of Penelec were the dates of issue and maturity, redemption prices, rates of interest, and dates for payment of interest. The indenture terms and the security behind these bonds were the same, none having priority over another of the aforesaid bonds.
59. The series H bonds were issued by Penelec to the holding companies for the purpose of being used to refinance Penelec’s 3y2 percent notes of 1932. The series II bonds were exchanged for the series E and G bonds because the series H bonds constituted more security than the series E and G bonds, and by effecting a reduction of Pene-lec debt, • it would improve the financial condition of Penelec.
60. The reason why a lesser principal amount of series H bonds — i. e., $12,000,000 — was issued in exchange for a greater principal amount of series E and G bonds — i. e., $13,551,-000 — was to enable Penelec to reduce its debt, so that its balance sheet and financial position would be improved and the offer of the series H bonds in exchange for the 3% percent notes of 1932, would therefore be more attractive.
61. Prior to June 30,1932, $1,13'5,000 principal amount of the $9,000,000 of Penelec’s 3y2 percent notes of 1932 had been acquired by holding companies of the Associated System and $1,130,000 principal amount had been turned back to Penelec on open account.
*336 62. In an attempt to meet the maturity of Penelee’s 3% percent notes of 1932, of which $7,870,000 principal amount was outstanding in July 1932, $5,000,000 in the hands of the public and $2,870,000 held by Aelec, on or about July 21, 1932, Associated Gas and Electric Securities Company (hereinafter referred to as “Agesec”), which was a 100 percent owned subsidiary member in the affiliated group and engaged in the business of buying, selling, or exchanging securities of the companies in the Associated System with parties outside the affiliated group, made an offer to the holders of the 3y2 percent notes of 1932 to exchange said notes for Penelec series H bonds on the basis of $6,000 principal amount of the series H bonds and $200 in cash for each $5,000-principal amount of such notes. The offer, as set out in letters dated July 21, 1932, from Agesec and Penelec to the holders of the 3% percent notes of 1932 is set forth in exhibit NN-1 and plaintiffs’ exhibit 1, respectively, which are incorporated herein by reference. Holders of $710,000 principal amount of the 3y2 percent notes of 1932 accepted this exchange offer, receiving $28,400 in cash and $852,000 principal amount of series H bonds in exchange, and turned their notes in to the holding company.
63. The holding companies acquired $2,300,000 principal amount of the Penelec 3y2 percent notes of 1932 for cash or its equivalent and $510,000 principal amount of the 3% percent notes of 1932 in exchange for bonds of New Jersey Power & Light Company and cash.
64. On or about July 27,1932, Agesec made another offer to the holders of the 3y2 percent notes of 1932 under which these notes were exchangeable for either One, Two, or Three-Year Gold Notes of Penelec bearing interest at the rate of' 6% percent, 7 percent, and 7% percent, respectively (hereinafter referred to as the “One, Two, or Three Year Gold-Notes”). It was proposed to issue, and there was in fact issued, an aggregate principal amount of $5,330,000 of said Gold Notes, each of which was convertible, at the option of the holder, into series H bonds on the basis of $1,200 principal amount of series H bonds for each $1,000 principal-amount Gold Notes. The offer as set out in a letter, dated July 27,1932, to the holders of the Sy2 percent notes of 1932: *337 is set forth in exhibit 00-1 and is incorporated herein by reference. Under that offer, $1,030,000 principal amount of the 3 y2 percent notes of 1932 were turned in to the holding company.
65. For the purpose of retiring the balance of its publicly held 3y2 percent notes of 1932, in the principal amount of $3,320,000 Penelec sold approximately $3,585,000 principal amount of said One Year Gold Notes to Chase Harris Forbes Corporation for $3,477,450 net cash.
66. On August 1, 1932, in connection with the issuance of the One, Two, and Three Year Gold Notes, Penelec and Aelec entered into an escrow agreement with the Chase National Bank of the City of New York, pursuant to which there was deposited by Aelec with said bank, as escrow agent, $6,396,000 principal amount series H bonds to be used by the escrow agent in making exchanges for such of the One, Two, or Three Year Gold Notes as were presented to the escrow agent therefor, at the rate of $1,200 principal amount series H bonds for each $1,000 principal amount One, Two, or Three Year Gold Notes. Under the terms of the escrow agreement when Gold Notes were turned in to the escrow agent for series H bonds, the escrow agent was required to turn the Gold Notes over to Aelec. On August 1, 1932, Penelec entered into a supplementary indenture amending its mortgage indenture, dated December 1, 1919, pursuant to which the Penelec series H bonds had been issued, by adding thereto additional covenants and agreements, which is contained in exhibit QQ, and is incorporated herein by reference.
67. The One, Two, and Three Year Gold Notes which were received by the escrow agent and delivered by it to Aelec, were transferred to Penelec by Aelec.
68. The maturity of the $9,000,000 of 3y2 percent notes of 1932 was thus met as follows: '

Prinoipal amount

(a) Reacquired by holding companies and turned back to Penelec on open account prior to June 30, 1932_$1,130,000
(b) On acceptance of holding company offer to deliver in exchange for each $5,000 principal amount of 3 %% notes of 1932 $6,000 principal amount of Series H bonds and pay $200 in cash_ 710,000

*338
Principal amount

(c) On exchange with holding companies for securities, cash or its equivalent-$2, 300, 000
(d) On exchange with holding companies for bonds of New Jersey Power & Light Company and Cash-510,000
(e) On exchange for Penelec One, Two, and Three Year Gold Notes_ 1,030, 000
(f) Cash paid by Penelec, raised through the sale of $3,585,000 principal amount of its 6%% notes due in 1933_ 3,320, 000
Total_ 9,000,000
69. The holding companies received open account credits from Penelec in the face amount of the 314 percent notes of 1932 thus acquired by them and turned over to Penelec, namely $5,680,000, except that $2,870,000 face amount of the 31/2 percent notes of 1932 were exchanged for (a) a Penelec 6 percent note in the face amount of $2,540,000 due December 1, 1935 and (b) $330,000 face amount of the 614 percent Gold Notes of 1933.
70. Approximately $4,361,000 principal amount of the series H bonds were exchanged by the various members of the affiliated group owning series H bonds with nonaffiliates for the various issues of Penelec Gold Notes. $852,000 principal amount of the series H bonds were exchanged by the holding companies with nonaffiliates on the basis of $6,000 principal amount of series H bonds, plus $200 in cash for each $5,000 of Penelec 3y2 percent notes of 1932 acquired. The remaining $3,509,000 principal amount of said series H bonds thus utilized by the holding companies were exchanged for the Penelec One, Two, and Three Year Gold Notes on the basis of $1,200 principal amount of series H bonds for each $1,000 Penelec note so acquired.
71. During the years 1932 and 1933, members of the affiliated group made net sales to, or exchanges with, persons not' members of the affiliated group of $9,314,800 principal amount, including the exchanges referred to in finding 70, of the $12,000,000 principal amount of Penelec series H bonds issued in the May 1932, exchange and received therefor a net amount of $7,249,162.82 in cash and market value of securities, prior to reduction for commissions paid. .
72. In August 1932, Agecorp sold $1,000,000 principal amount of series H bonds to Chase Harris Forbes Corpora *339 tion for a price of $83 per $100 principal amount less a commission of $5, or a net price of $78 per $100 principal amount. Toward the end of August 1932 two additional blocks of series H bonds were sold by Agecorp to Chase Harris Forbes Corporation, one block of $300,000 principal amount at $79.75 per $100 principal amount and the other block of $101,000 principal amount at $78 per $100 principal amount.
73. Without taking into account the effects of blockage, the fair-market value on May 7, 1932, of a series H bond was $87.15 per $100 principal amount, the fair-market value of a series E bond was $78.64 per $100 principal amount and the fair-market value of a series G bond was $73.45 per $100 principal amount. It would not have been possible to sell $12,000,000 principal amount of series H bonds on May 7,1932, for $87.15 per $100 principal amount.
•74. In May 1932, the trend of the market for public utility operating company bonds was down and the market was close to the low for the year 1932. This was reflected in the averages of yields to maturity of public utility operating company bonds, shown by plaintiffs’ exhibit 8, which is incorporated herein by reference. We were in a depression, with widespread unemployment. Business conditions were at the very bottom and stock and bond prices were at about their bottom. Many individual security holders had lost their savings in the market. Fear and uneasiness on the part of investors resulted in lack of funds coming in. for the purchase of securities. On July 2, 1932, one of the largest public utility systems in the country, the Insull System, was declared bankrupt. Public utility securities were particularly vulnerable in the light of the disclosures of the Federal Trade Commission and State public utility commission investigations as to the financing practices of such companies. Moreover, a number of public utility holding companies, including the Insull and Associated Systems, had large maturities of bank notes coming due in 1932. The anxiety on the part of investors as to whether these maturities would be met had a decidedly adverse effect on bond buying. The problems of the Associated System and of Penelec in particular were accentuated by the necessity of meeting large maturities of obligations.
*340 75. In marketing a large block of securities, weight must be given to the discount between the price which would be received by a seller of a nominal amount of securities and the price at which a large block can be sold. This factor, known as blockage, includes the larger underwriting commission on a wholesale sale and a larger commission than is involved on a small sale in view of the risks involved to the underwriter. The amount of blockage is affected by market condition. The discount for blockage suffered on various public sales > of public utility bonds rated A by Moody’s Investors Service, a standard utility bond service relied on in the public utility, market during 1932 and 1833, are shown by plaintiffs’ exhibits 9 and 11, which are incorporated herein by reference. The Penelec series H bonds were rated A by Moody’s Investors Service.
76. In consideration of the experience in marketing large blocks of comparable and superior bonds with established markets during 1932, the necessity for marketing the bonds through underwriters, and all the other factors affecting the marketing of a block of $12,000,000 of series H bonds on May 7,1932, if a block of $12,000,000 of series H bonds had been sold on May 7,1932, the proceeds would not have been higher than $78 per $100 principal amount.
77. The transaction of May 1932 whereby Penelec issued $12,000,000 principal amount of its series H bonds for $13,-551,000 principal amount of its series E and G bonds was engineered by the associated holding companies for the purpose of improving the financial condition of Penelec and meeting the maturing obligation of the, Penelec 3% percent notes of 1932. The result of the transaction was a reduction of the debt of Penelec by $1,551,000 and the acquisition by the holding companies of the series H bonds, which were utilized to make the exchange offer of July 21,1932, and to provide for the conversion into series H bonds of the Gold Notes issued under the July 27,1932, exchange offer (finding 64) and those sold to Chase Harris Forbes Corporation (finding 65). The transaction was intended by Agecorp and Aelec to be, and was regarded by Penelec as, a capital contribution to Penelec.
*341 78. The $1,551,000 by which the principal amount of series E and series G bonds received by Penelec from Aelec and Agecorp exceeded the principal amount of the series H bonds issued in exchange therefor in the May 7, 1932, transaction was initially credited to capital surplus on the books of Penelec. This was done because both Penelec and the parent companies making the exchange regarded the excess of the principal amount of the bonds being retired over the principal amount of the bonds being issued in exchange therefor as a capital contribution, designed to improve Penelec’s balance sheet and financial position.
' 79. Subsequently, but by the same journal entry, Penelec on its books, debited “capital surplus” and credited “un-amortized premium on debt” in the amount of $1,551,000. The latter entry was made solely to comply with the requirements of the classification of accounts prescribed by the Pennsylvania Public Service Commission at that time. The Pennsylvania Commission’s classification of accounts at that ■time required a public utility company which issued its own bonds of a lesser principal amount in exchange for a larger principal amount of its outstanding bonds to credit the excess to “unamortized premium on debt,” irrespective of the comparative market values of the incoming and outgoing bonds. Except for the requirement of the Pennsylvania Commission’s classification of accounts, the $1,551,000 excess principal amount of series E and G bonds over the series H ■bonds would not have been credited to unamortized premium on debt.
80. Neither Penelec nor the parent companies making the exchange regarded the transaction as the issuance of the series H bonds at a premium. In view of the situation affecting a sale of a large block of bonds on May 7, 1932 (finding 76), $12,000,000 principal amount of those bonds could not have been issued at that time at a premium in an arm’s length transaction with a willing buyer.
81. The Penelec accounting entries relating to the May 1932 transaction indicate that the transaction was regarded by Penelec as a capital contribution of $1,551,000 by the indirect parent companies; they do not indicate that the series H bonds were issued as a premium. The method of crediting *342 capital surplus with the $1,551,000 excess of principal amount of series E and G bonds over series H bonds, and then, as required by the Pennsylvania classification of accounts, of transferring the credit to unamortized premium on debt, was correct accounting treatment to reflect the intention of the parties and to treat the transaction as a capital contribution; In this way through the initial crediting of the excess of $1,551,000 of principal amount of series E and G bonds over series H bonds to capital surplus, the capital contribution character of the item was reflected in the books. The subsequent transfer of the excess to unamortized premium on debt satisfied the requirements of the Pennsylvania Public Service Commission.
82. During April 1933, Penelec issued, at $83% for each $100 principal amount, $4,155,500 principal amount of series H bonds to its parent, Penelecorp, and received cash or credit on open account amounting to $3,462,916.75. Also, during the month of April 1933, Penelecorp transferred these series H bonds to its parent, Aelec, on open account at the same price — $3,462,916.75. During March and April 1933, Penelec purchased at par and cancelled $3,463,000 principal amount of its 6% percent Gold Notes maturing on August 1, 1933, which were owned by Aelec.
83. On December 31, 1933, members of the affiliated group held $6,901,700 principal amount of the series H bonds. On December 31,1933, the fair market value of a series H bond, without taking blockage into account, was $71.54 per $100 principal amount. However, it would not have been possible to sell $6,900,000 or $2,685,000 principal amount of such bonds on December 31, 1933, for $71.54 per $100 principal amount. In the light of . the downward trend of the bond market in December 1933, the factors comparable to those referred to in findings 75 and 76, the fact that difficulties in marketing so large.a block were increased by reason of the Securities Act of 1933, the actual prices at which series H bonds were quoted about December 31, 1933, and all other factors affecting the marketing of such blocks of bonds, a sale on December 31,1933, of a block of $6,900,000 principal amount series H bonds would have resulted in proceeds not higher than $62 per $100 principal amount, and a sale on December *343 31, 1933, of a block of $2,685,000 principal amount series H bonds would have resulted in proceeds not higher than $62 per $100 principal amount. The bid and asked quotations for the series H bonds for the years 1932 and 1933 and for the year 1934 through June, as furnished by the National Quotation Bureau, which is relied on in the financial markets, are set forth in plaintiffs’ exhibit 10, which is incorporated herein by reference.
84. In November of 1934, during a taxable year for which separate Federal income tax returns were filed by the members of the affiliated group, $1,158,000 principal amount of series H bonds were issued by Penelec to its parent, Penelecorp, on open account, at $88 for each $100 principal amount, or a total of $1,019,040. Thereafter, in November 1934, Penelecorp transferred these bonds to its parent, Aelec, on open account at the same price.
During the year 1933, Penelec declared dividends payable on its outstanding stock of $860,000 which was set up as an accrued liability on its balance sheet as of December 31, 1933. On July 31, 1934, Penelec paid dividends on its outstanding stock totaling $1,892,500. At various times during the year 1935, Penelec paid dividends on its outstanding stock totaling $2,125,000.
85. At all times from January 1, 1942, to the respective dates of their retirement, $17,313,500 principal amount of series H bonds were outstanding: this included the $12,000,-000 principal amount of such bonds issued in May 1932 in exchange for Penelec’s series E and G bonds, the $4,155,500 principal amount of series H bonds issued in 1933, and the $1,158,000 principal amount of such bonds issued during 1934, as set forth in findings 57, 82, and 84, respectively.
86. At all times from January 1, 1942, to the respective dates of their retirement, $3,159,700 principal amount of the series H bonds were owned by members of the 1942 affiliated group, of which $3,075,700 principal amount were owned by Aelec, $61,000 by Dover Casualty Insurance Company, and $23,000 by NYPANJ Utilities Company. The balance, $14,153,800 principal amount of the series H bonds, was owned from January 1, 1942, to the date of retirement by persons not members of the 1942 affiliated group.
*344 ■ 87. On or about March. 4, 1942, the aforesaid $3,075,700 principal amount of series H bonds owned by Aelec were redeemed through the issuance of common stock by Penelec to Aelec in exchange therefor. On or about April 11,1942, the remaining $14,237,800 principal amount of series H bonds of Penelec outstanding, which includes the bonds held by affiliates Dover Casualty Insurance Company and NYPANJ, as set forth in finding 86, were redeemed for cash by Penelec at the principal amount thereof, plus a $5 premium for each $100 principal amount.
The laws of the State of Pennsylvania provide a uniform classification of accounts for electric companies under which the utility is required to set up on its books and records an account designated as unamortized premium on debt. The law requires that all premiums received by the utility from the issue of bonds and other evidences of indebtedness which do not mature until more than one year after the date of their issue shall be credited to this account. The law states that by premium is meant the excess of the actual cash value of the consideration received for such bonds and other evidences of indebtedness over the sum of the par value thereof and the interest accrued thereon at the time of their issue.
Pursuant to the requirements of the aforesaid laws of Pennsylvania, Penelec set up an unamortized premium on debt account on its books and credited thereto in May 1932 the sum of $1,551,000. This sum represented the difference in the face amount of Penelec series E and G bonds received in exchange for its $12,000,000 series H bonds issued on May 7, 1932. The account, unamortized premium on debt, was included in the balance sheets reported on the returns of Penelec for the years 1934 through 1940, but at the end of each year the amount was reduced by the prorated sum of $51,804.60. The balance sheet of Penelec as of December 31,1941, does not show the separate account of unamortized premium on bonds.
88. In determining the income tax liability of Penelec for the calendar years 1934,1935,1936,1937,1938,1940, and 1941, the Commissioner included in its taxable net income for each of these years the sum of $29,115 as the portion of an *345 alleged premium resulting from tbe aforesaid May 7, 1932, intercorporate exchange of series H bonds for series E and G bonds. The Commissioner determined that Penelee received a premium of $873,450 on the transaction represented by the difference between the principal amount of the series E and G bonds of $13,551,000, less the unamortized discount thereon of $677,550, or $12,873,450, and the $12,-000,000 face amount of the series H bonds issued. It was further determined by the Commissioner that the aforesaid alleged net premium of $873,450 was amortizable over the life of the series H bonds, which was 30 years from the date of issuance. The sum of $29,115, which was included in Penelec’s taxable income for each of the years 1934 to-1938, inclusive, and 1940 and 1941, represents l/30th of the $873,450 alleged premium.
89. The internal revenue agent in charge at Baltimore determined that no premium had been realized by Penelee on the aforesaid exchange in May 1932 of the $12,000,000 series H bonds for the $13,551,000 series E and G bonds, and in auditing Penelec’s income tax returns for the years 1934, 1935, 1936, 1937, and 1938, mailed to Penelee copies of revenue agent’s reports so determining. Such letters and reports, as set forth in exhibits E, O-l, and P-1, are incorporated herein by reference. Such determinations for the years 1934 and 1935 were subsequently reversed by the internal revenue agent in charge at Baltimore, and for the years 1936, 1937, and 1938, by a notice of deficiency issued by the Commissioner.
90. The Commissioner allowed as a deduction from Pen-elec’s income for the years 1934 to 1938, inclusive, and 1940 and 1941, the allowable portion of the discount of $692,-583.33 at which he determined the series H bonds were issued by Penelee during the month of April 1933. The Commissioner also allowed as a deduction from Penelec’s taxable income for the years 1934 to 1938, inclusive, and 1940 and 1941, the allocable portion of the discount of $138,960 at which the series H bonds were issued by Penelee during November 1934.
91. In determining Penelec’s 1942 net income subject to declared value excess profits tax and the consolidated taxable *346 net income for the year 1942 of the 1942 affiliated group, the Commissioner included in taxable income the unamortized balance of the determined alleged net premium attributable to that portion of the $12,000,000 principal amount series H bonds redeemed for cash in .1942 which had been, issued by Penelec on May 7,1932, as aforesaid.
92. The amount of the unamortized balance of the determined alleged net premium thus included in the plaintiffs’ taxable income for the year 1942, on which Penelec paid declared value excess profits tax and the 1942 affiliated group paid Federal income tax is not less than $478,735.68 and not more than $501,268.07. It was agreed on the record between counsel for the plaintiffs and counsel for the Government that in the event the decision herein should make it material, agreement as to the amount of the unamortized balance of the .alleged net premium which was included by the Commissioner and upon which tax and interest thereon was paid by Penelec in respect of its declared value excess profits tax alleged liability for 1942 and by the 1942 affiliated group in respect of its alleged liability for Federal income tax for that year, would be reached by the parties, and in the event agreement should not be reached, further evidence may be adduced to establish the precise amounts thereof.
93. In determining Penelec’s 1942 net income subject to declared value excess profits tax and the consolidated taxable net income for the year 1942 of the 1942 affiliated group, the Commissioner rejected the plaintiffs’ claim for allowance as a deduction from taxable income of unamortized discount claimed by Penelec with respect to the Penelec series H bonds issued in the intercorporate exchange for the series E and G bonds on May 7, 1932.
94. In determining Penelec’s 1942 net income subject to declared value excess profits tax and the consolidated taxable net income for the year 1942 of the 1942 affiliated group, the Commissioner allowed as a deduction from taxable income the unamortized balance as of January 1,1942, of the discount of $692,583.33 determined by him to have been sustained upon the issuance of $4,155,500 principal amount of series H Bonds in April 1933 and the unamortized balance of the discount of $138,960 sustained upon the issuance of $1,158,000 principal *347 amount of series H Bonds in November 1984. The Commissioner rejected the plaintiffs’ claim for allowance of additional discount with respect to the series H Bonds issued in April 1933.
--.CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiffs are entitled to recover with interest according to law.
The entry of judgment is suspended to await the filing of a stipulation by the parties showing the amount due the plaintiffs in accordance with this opinion.
In this case, on a stipulation by the parties, an order was ■entered on March 6,1956, rendering judgments as- follows:
Now, Therefore, It Is Ordered this sixth day of March, 1956, that judgment be and the same is entered for plaintiff, Pennsylvania Electric Company, in the amount of fifty-four thousand eight hundred and thirty-one dollars and seventeen cents ($54,831.17, together with interest thereon as provided by law which sum consists of the following overpayment of taxes and interest for the indicated years:

Overpayment Overpayment of Interest Year of Taw .on Taw

1934-$4, 003.31 $1,141. 68
1935___ 3, 508.42 877. 68
1936- 5,656. 72 ' ' 2,279.42
1937- 4,121.95 1,413.66
1938- 5, 827.35 .. V JL, 648. 90
1940- 6,806.40 973.03
1941_ 9,025. 65 911.47
1942- 5, 887. 93 747.60
It Is Further Ordered that judgment be and the same is entered for plaintiff, General Public Utilities Corporation, as common parent corporation of a group of affiliated corporations, in the amount of two hundred thirty-two thousand, nine hundred and thirty-three dollars and ■sixty-three cents ($232,933.63), together with interest thereon as provided by law which sum consists of an overpayment of tax of $201,068.99 for the year 1942 and an overpayment of interest thereon in the amount of $31,864.64.